Filed 4/15/13
CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| COASTSIDE FISHING CLUB, | D061121 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2011-00084611-CU-WM-CTL) |
| CALIFORNIA FISH AND GAME COMMISSION, | |
| Defendant and Respondent. | |

APPEAL from an order of the Superior Court of San Diego County, Ronald S. Prager, Judge. Affirmed.


Allen Matkins Leck Gamble Mallory & Natsis, David Duval Cooke, Marvin Earl Garrett, Kathryn Diane Horning; Law Office of Marc Mager Gorelnik and Marc Mager Gorelnik for Appellant.

Kamala D. Harris, Attorney General, Kathleen A. Kenealy, Assistant Attorney General, Carol A. Squire, Deputy Attorney General for Respondent.

Plaintiff Coastside Fishing Club (Coastside) appeals an order denying its petition for a writ of mandate directing the California Fish and Game Commission (the Commission) to vacate its regulations that create Marine Protected Areas (MPAs) and Marine Managed Areas (MMAs) in state waters of an area of the Pacific Ocean known as the North Central Coast study region. Coastside contends the trial court erred in denying its petition on the ground it failed to exhaust its administrative remedies and in ruling, on the merits, that the Commission acted within its statutory authority in adopting the regulations for the North Central Coast region (NCC regulations). We conclude the court erred in applying the doctrine of exhaustion of administrative remedies, but correctly ruled that the Commission acted within its statutory authority in adopting the NCC regulations. Accordingly, we affirm.

STATUTORY BACKGROUND

Marine Life Protection Act

In 1999 the Legislature enacted the Marine Life Protection Act (MLPA). (Fish & G. Code, § 2850 et seq.) The Legislature declared that "California's marine protected areas (MPAs) were established on a piecemeal basis rather than according to a coherent plan and sound scientific guidelines.[1] Many of these MPAs lack clearly defined

---

1    Fish and Game Code section 2852, subdivision (c), defines "marine protected area" as follows: " 'Marine protected area' (MPA) means a named, discrete geographic marine or estuarine area seaward of the mean high tide line or the mouth of a coastal river, including any area of intertidal or subtidal terrain, together with its overlying water and associated flora and fauna that has been designated by law, administrative action, or voter initiative to protect or conserve marine life and habitat. An MPA includes marine life reserves and other areas that allow for specified commercial and recreational

2

purposes, effective management measures and enforcement. As a result, the array of MPAs creates the illusion of protection while falling far short of its potential to protect and conserve living marine life and habitat." (Fish & G. Code, § 2851, subd. (a).) Thus, the main objective of the MLPA was to "modify the existing collection of MPAs to ensure that they are designed and managed according to clear, conservation-based goals and guidelines that take full advantage of the multiple benefits that can be derived from the establishment of marine life reserves." (Fish & G. Code, § 2851, subd. (h).)

The MLPA requires the Commission to adopt a "Marine Life Protection Program" with specified goals designed to protect marine life (Fish & G. Code, § 2853), and to "adopt a master plan that guides the adoption and implementation of the Marine Life Protection Program . . . and decisions regarding the siting of new MPAs and major modifications of existing MPAs." (Fish & G. Code, § 2855, subd. (a).) The MLPA directs the Department of Fish and Game[2] to prepare, or contract for the preparation of, the master plan and to convene "a master plan team to advise and assist in the preparation

activities, including fishing for certain species but not others, fishing with certain practices but not others, and kelp harvesting, provided that these activities are consistent with the objectives of the area and the goals and guidelines of this chapter. MPAs are primarily intended to protect or conserve marine life and habitat, and are therefore a subset of marine managed areas (MMAs), which are broader groups of named, discrete geographic areas along the coast that protect, conserve, or otherwise manage a variety of resources and uses, including living marine resources, cultural and historical resources, and recreational opportunities."

[2] Effective January 1, 2013, the Department of Fish and Game was renamed the Department of Fish and Wildlife. (Fish & G. Code, § 37.) For convenience, we will refer to the agency by its original name used in the proceedings below, the Department of Fish and Game (DFG).

of the master plan, or hire a contractor with relevant expertise to assist in convening such a team." (Fish & G. Code, § 2855, subd. (b)(1).) The master plan team members must "have expertise in marine life protection and . . . be knowledgeable about the use of protected areas as a marine ecosystem management tool." (Fish & G. Code, § 2855, subd. (b)(2).) The team is to include staff from the DFG, the Department of Parks and Recreation, and the State Water Resources Control Board. (Fish & G. Code, § 2855, subd. (b)(3)(A).) Five to seven team members must be scientists (Fish & G. Code, § 2855, subd. (b)(3)(B)), and the DFG is authorized to "engage other experts to contribute to the master plan, including scientists, geographic information system (GIS) experts, and commercial and recreational fishermen, divers, and other individuals knowledgeable about the state's underwater ecosystems, the history of fishing effort or MPA management, or other relevant subjects." (Fish & G. Code, § 2855, subd. (b)(5).)

One of the main components of the master plan is "[r]ecommended alternative networks of MPAs, including marine life reserves in each biogeographical region that are capable of achieving the goals [of the MLPA]." (Fish & G. Code, § 2856, subd. (a)(2)(D).) The DFG is required to "convene, in each biogeographical region and to the extent practicable near major working harbors, siting workshops, composed of interested parties, to review the alternatives for MPA networks and to provide advice on a preferred siting alternative." (Fish & G. Code, § 2857, subd. (a).) Following public review, at least three public meetings, and appropriate modifications to the draft master plan, the DFG was required to submit, on or before April 1, 2005, a proposed final master plan to the Commission. (Fish & G. Code, § 2859, subd. (b).) However, the DFG was unable to

4

meet that statutory time limit.  (See *Coastside Fishing Club v. California Resources Agency* (2008) 158 Cal.App.4th 1183, 1196-1197 (*Coastside*).)  Fish and Game Code section 2861, subdivision (b), provides that nothing in the MLPA "restricts any existing authority of the [DFG] or the [C]ommission to make changes to improve the management or design of existing MPAs or designate new MPAs prior to the completion of the master plan."[3]

Marine Managed Areas Improvement Act

In 2000, one year after it enacted the MLPA, the Legislature passed the Marine Managed Areas Improvement Act (Pub. Resources Code[4], §§ 36600–36900) (Improvement Act).  An MMA is statutorily defined as "a named, discrete geographic marine or estuarine area along the California coast designated by law or administrative action, and intended to protect, conserve, or otherwise manage a variety of resources and their uses.  The resources and uses may include, but are not limited to, living marine resources and their habitats, scenic views, water quality, recreational values, and cultural or geological resources."  (§ 36602, subd. (d).)[5]  The Legislature noted that the array of state MMAs existing at the time it passed the Improvement Act was the "result of over 50

---

[3]     The quoted provision was formerly subdivision (c) of Fish and Game Code section 2861.  However, a 2012 amendment deleted former subdivision (b) of the statute and re-lettered former subdivision (c) as subdivision (b).  (Stats. 2012, ch. 728, § 46, p. 5872.)

[4]     All subsequent statutory references are to the Public Resources Code unless otherwise specified.

[5]     As noted, MPAs are a subset of MMAs.  (Fish & G. Code, § 2852, subd. (c).)

years of designations through legislative, administrative, and statewide ballot initiative actions, which [had] led to 18 classifications and subclassifications of these areas." (§ 36601, subd. (a)(4).)

A report prepared by a State Interagency Marine Managed Areas Workgroup indicated that the MMAs had "evolved on a case-by-case basis, without conforming to any plan for establishing MMAs in the most effective way or in a manner which ensures that the most representative or unique areas of the ocean and coastal environment are included." (§ 36601, subd. (a)(5).) The report also stated that California's MMAs did not comprise an organized system because "the individual sites [were] not designated, classified, or managed in a systematic manner[,]" and many of the MMAs lacked "clearly defined purposes, effective management measures, and enforcement." (§ 36601, subd. (a)(6).) The Legislature found that this array of MMAs created the illusion of a comprehensive system of management while it actually "[fell] short of its potential to protect, conserve, and manage natural, cultural, and recreational resources along the California coast." (§ 36601, subd. (a)(7).) Designation of MMAs and subsequent adoption of regulations without adequate consideration given to overall classification objectives had "contributed to fragmented management, poor compliance with regulations, and a lack of effective enforcement." (§ 36601, subd. (a)(9).)

Thus, the Legislature's express intent was that "[w]ith the single exception of state estuaries, . . . the classifications currently available for use in the marine and estuarine environments of the state shall cease to be used and that a new classification system shall be established, with a mission, statement of objectives, clearly defined designation

6

guidelines, specific classification goals, and a more scientifically-based process for designating sites and determining their effectiveness." (§ 36601, subd. (b).) The Legislature declared that "[t]he mission of the state MMA system is to ensure the long-term ecological viability and biological productivity of marine and estuarine ecosystems and to preserve cultural resources in the coastal sea . . . ." (§ 36620.) The Legislature found and declared a need to redesign California's MMAs to establish and manage a system using science and clear public policy directives to achieve the objectives of conservation, education and research, sustainable use of marine resources, and providing opportunities for public enjoyment of natural and cultural marine and estuarine resources. (*Ibid.*) Under the new classification system, there are six MMA classifications: (1) state marine reserves, (2) state marine parks, (3) state marine conservation areas, (4) state marine cultural preservation areas, (5) state marine recreational management areas, and (6) state water quality protection areas. (§§ 36602, subd. (d) & 36700 [defining the six classifications].) State marine reserves, state marine parks, and state marine conservation areas are also statutorily designated as MPAs. (§ 36602, subd. (e).)

The Improvement Act directed the Secretary of the California Resources Agency (Resources Agency)[6] to establish a "State Interagency Coordinating Committee" (Coordinating Committee), consisting of representatives from various state agencies with jurisdiction or management interests over MMAs, including the DFG, Department of

---

6    In 2008 Resources Agency was renamed the Natural Resources Agency. (Gov. Code, §§ 12800, 12802, 12805; Stats. 2008, ch. 205, §§ 1-2, 4.)

7

Parks and Recreation, California Coastal Commission, State Water Resources Control Board, and State Lands Commission. (§ 36800.) Section 36800 provides that the Coordinating Committee "shall review proposals for new or amended MMAs to ensure that the minimum required information is included in the proposal, to determine those state agencies that should review the proposal, and to ensure consistency with other such designations in the state. The committee shall also serve to ensure the proper and timely routing of site proposals, review any proposed site-specific regulations for consistency with the state system as a whole, and conduct periodic reviews of the statewide system to evaluate whether it is meeting the mission and statement of objectives." (*Ibid.*) The Coordinating Committee is also responsible for reclassifying any MMA in existence on January 1, 2002, that has not been reclassified in accordance with the MLPA, with the directive that the reclassification process "shall occur to the extent feasible in conjunction and consistent with the MMA master planning process created pursuant to the [MLPA]." (§ 36750.) The existing MMAs must be reclassified under the classification system described in section 36700, which defines the Improvement Act's six MMA classifications noted above.

The Coordinating Committee and appropriate "managing agencies"[7] were directed to cooperate to develop, on or before January 1, 2002, "[d]esignation guidelines based on

_____

7       The Improvement Act refers to "designating entities" and "managing agencies." A "designating entity" is "the Fish and Game Commission, State Park and Recreation Commission, or State Water Resources Control Board, each of which has the authority to designate specified state marine managed areas." (§ 36602, subd. (b).) A "managing agency" is either "the Department of Fish and Game or the Department of Parks and

the classification goals adopted for the state system of MMAs . . . ."  (§ 36850.)  The designation guidelines "shall be used to provide a general sense of requirements for designating a site in any particular classification, and may include characteristics such as uniqueness of the area or resource, biological productivity, special habitats, cultural or recreational values, and human impacts to the area.  These designation guidelines shall be provided on a standard set of instructions for each classification."  (*Ibid.*)  The Coordinating Committee was also directed to establish, on or before January 1, 2002,  the "standard set of instructions for each classification to guide organizations and individuals in submitting proposals for designating specific sites or networks of sites."  (§ 36870.)  Section 36900 provides that "[i]ndividuals or organizations may submit a proposal to designate an MMA directly through the [Coordinating Committee] or an appropriate designating entity.  Proposals submitted to a designating entity shall be forwarded to the [Coordination Committee] to initiate the review process."

Concurrently with the Improvement Act, the Legislature amended Fish and Game Code sections 1580, and enacted Fish and Game Code sections 1590 and 1591.  Fish and Game Code section 1580 had previously authorized the DFG and the Commission to establish terrestrial, fresh water, and *marine* ecological reserves.  The Legislature amended Fish and Game Code section 1580 to exclude marine reserves from the scope of

_____

Recreation, each of which has the authority to manage specified state marine managed areas."  (§ 36602, subd. (b).)

9

that statute,[8] and passed Fish and Game Code section 1590, which authorized the Commission to "designate, delete, or modify state marine recreational management areas established by the commission for hunting purposes, state marine reserves, and state marine conservation areas, as delineated in subdivision (a) of Section 36725 of the [Improvement Act]." (Fish & G. Code, § 1590.)[9] Fish and Game Code section 1591 provides that any proposals for MPAs made after January 1, 2002, must follow the guidelines set forth in the Improvement Act, and that pursuant to section 36750 of the Improvement Act, all MPAs in existence on that date and not reclassified in accordance

---

[8]     Fish and Game Code section 1580 currently provides:  ";The Legislature hereby declares that the policy of the state is to protect threatened or endangered native plants, wildlife, or aquatic organisms or specialized habitat types, both terrestrial and *nonmarine aquatic*, or large heterogeneous natural gene pools for the future use of mankind through the establishment of ecological reserves.  For the purpose of establishing those ecological reserves, the department, with the approval of the commission, may obtain, accept on behalf of the state, acquire, or control, by purchase, lease, easement, gift, rental, memorandum of understanding, or otherwise, and occupy, develop, maintain, use, and administer land, or land and *nonmarine water*, or land and *nonmarine* water rights, suitable for the purpose of establishing ecological reserves.  Any property obtained, accepted, acquired, or controlled by the department pursuant to this article may be designated by the commission as an ecological reserve.  The commission may adopt regulations for the occupation, utilization, operation, protection, enhancement, maintenance, and administration of ecological reserves.  The ecological reserves shall not be classified as wildlife management areas pursuant to Section 1504 and shall be exempt from Section 1504." (Italics added.)  The 2000 amendment also deleted the word "marine" from the phrase, "large heterogeneous natural marine gene pools" in the former statute.  (See Stats. 1993, ch. 667, § 1 (A.B. 521).)

[9]     Section 36725, subdivision (a), provides that the Commission "may designate, delete, or modify state marine recreational management areas established by the commission for hunting purposes, state marine reserves, and state marine conservation areas."

10

with the MLPA must be reclassified as a state marine reserve, state marine park, or state marine conservation area. (Fish & G. Code, § 1591, subd. (a).)

FACTUAL AND PROCEDURAL BACKGROUND

The NCC regulations at issue in this appeal were the result of a "public-private partnership," the genesis of which is discussed in *Coastside*, *supra*, 158 Cal.App.4th 1183. The DFG was unable to meet the statutory time limit for submitting a proposed final master plan to the Commission under the MLPA due to inadequate funding. (*Coastside*, *supra*, at pp. 1196-1198.) Recognizing the DFG's long history of having insufficient funding to meet its statutory mandates, the Legislature declared that "[w]hile revenues have been declining, the [DFG's] responsibilities have increased in order to protect public trust resources in the face of increasing population and resource management demands. The [DFG's] revenues have been limited due to a failure to maximize user fees and inadequate non-fee-related funding. The limited department revenues have resulted in the inability of the department to effectively provide all of the programs and activities required under this code and to manage the wildlife resources held in trust by the department for the people of the state." (Fish & G. Code, § 710.5, subd. (a).) Thus, the Legislature declared that "[t]o fulfill its mandates, the [DFG] must secure a significant increase in reliable funding, in addition to user fees." (Fish & G. Code, § 710.5, subd. (c).) Toward that end, the Legislature declared its intent that the DFG "shall cooperate with the Legislature, recreational users, conservation organizations, the commercial fishing industry, and other interested parties to identify and propose new alternative sources of revenue to fund the department's necessary marine conservation,

11

restoration, and resources management, and protection responsibilities." (Fish & G. Code, § 710.7, subd. (c).)

In 2004, after it became clear that the DFG lacked sufficient resources to meet its statutory deadline to prepare the draft master plan, the Resources Agency, the DFG, and Resources Legacy Foundation (RLF), a private nonprofit foundation, entered into a memorandum of understanding (MOU) to facilitate the implementation of the MLPA by pursuing a set of stated objectives referred to as the California Marine Life Protection Act Initiative (Initiative or MLPA Initiative). In a written "Conceptual Overview" of the Initiative that was attached as an exhibit to the MOU, those objectives were identified as submitting the DFG's "Master Plan Framework" to the Commission by May 2005, preparing a comprehensive strategy for long-term funding of planning, management and enforcement of MPAs, designing and submitting the DFG's draft proposal for alternative networks of MPAs in an area along the central coast to the Commission by December 2005, developing recommendations for coordinating the management of marine protected areas with the federal government by November 2006, and securing agreement and commitment among state agencies with marine protected area responsibilities by November 2006 to complete statewide implementation of the Master Plan by 2011. The MOU listed the same objectives.

The conceptual overview of the Initiative stated that the Initiative would require leadership, policy advisors, stakeholder input, general public participation, science, resource management and technical expertise, interagency coordination, public-private partnership, and phased design and implementation. Regarding public-private

12

partnership, the overview stated: "Due to the limited staffing and funding resources of the Resources Agency and [the DFG], this proposal is dependent upon supplementing public funding with private resources to enhance the state's capacity to accomplish the science, analysis, planning, and coordination necessary to achieve the objectives on time. While private funding will support much of the costs of the Initiative, the work will be open and transparent."

The MOU adopted a phased approach to the MLPA master plan, stating that "[b]ased on its prior and ongoing efforts to prepare a draft Master Plan, the [DFG] has determined that it will be most effective to prepare the Master Plan in phases. Specifically, the [DFG] intends as part of the first phase to prepare a Master Plan Framework that will then be used to develop networks of MPAs within individual regions." The MOU stated the Master Plan Framework would "include a timeline to design and implement MPAs in phases by region, beginning with the development of alternative networks of MPAs for one specific region, namely, an area along the central coast, as part of the first phase." The MOU provided that the Secretary for the Resources Agency would appoint seven to ten unpaid advisors to a "California MLPA Blue Ribbon Task Force" to, among other duties, "oversee the preparation of the draft Master Plan Framework and the proposal for alternative networks of MPAs in an area along the central coast for the [DFG] pursuant to the MLPA and this MOU."

The process implemented by the first MOU resulted in the Commission's approval of a set of MPAs for the central coast region in April 2007. The regulations establishing those MPAs became effective in September 2007. The first MOU process also resulted

13

in the Commission's adoption of a "Revised Draft Master Plan for Marine Protected

Areas" (revised draft master plan) in February 2008.

On January 1, 2007, the Resources Agency, the DFG, and RLF entered into a

second MOU for the North Central Coast study region (NCC MOU). The main objective

of the NCC MOU was "to achieve the objectives of the [MLPA] for the second phase of

developing a statewide network [MPAs]." Another stated objective of the NCC MOU

was "[t]o refine the MLPA Initiative process to benefit from and be responsive to the

lessons learned in the first phase of the MLPA process for the Central Coast . . . ." Like

the first MOU, the NCC MOU provided that the Secretary for the Resources Agency

would appoint members of a Blue Ribbon Task Force (the Task Force). The Task Force's

duties under the NCC MOU were, among other things, to "guide the development of

alternative MPA proposals, modify proposals presented to the Task Force by the

Regional Stakeholders Group[10] as the Task Force deems appropriate and craft

alternative MPA proposals for presentation to the . . . Commission" and to "recommend

---

10    The revised master plan explains that "regional stakeholder groups are composed
of individuals from each study region who are able and willing to provide information
that will assist in developing alternative proposals for MPAs in their region. The chair of
the task force and the director of the [DFG] solicit nominations, and select from the
nominees regionally representative groups that meet regularly over the course of each
regional process. The stakeholder groups provide local knowledge for refining regional
profiles and informing the MLPA planning process, evaluate existing MPAs, provide
information to other stakeholder group members that may be helpful in designing
alternative MPA packages, develop alternative MPA proposals, conduct outreach to
constituent groups, and identify potential panel speakers to present stakeholder group
recommendations and commentary at task force and other public meetings."

to the . . . Commission a range of alternative proposals and a preferred MPA alternative proposal for the next phase of the MLPA Initiative process[.]" The NCC MOU called for extensive involvement by the DFG in the development of the MPA proposals.

In June 2008, the Task Force presented to the Commission five proposals for designating MPAs in the North Central Coast region. One proposal was to take no action and leave the 13 existing MPAs for the NCC region as they were. Three other proposals were from work groups within the Regional Stakeholders Group. The fifth proposal, developed in a meeting between members of the Regional Stakeholders Group and the Task Force, integrated elements of the three proposals from the Regional Stakeholders Group and was presented to the Commission as the "Integrated Preferred Alternative."

After conducting seven public hearings over a 14-month period, on August 5, 2009, the Commission adopted the Integrated Preferred Alternative proposal with minor modifications.[11] The Commission prepared a final statement of reasons regarding its adoption of the NCC regulations, including responses to comments (i.e., objections and recommendations) received at public hearings on the proposed regulations, as required by Government Code section 11346.9 of the Administrative Procedure Act (APA). (Gov.

---

[11]     The extensive public involvement in the process leading to Commission's adoption of the Integrated Preferred Alternative proposal as the NCC regulations is reflected by the following statement by a commissioner at the Commission's August 5, 2009 meeting: "You know, I counted the number of public meetings that we've have [*sic*] in the North Central Coast since 2007. That's in the documentation. And no fewer than 38 public meetings since 2007 on the North Central Coast alone. In fact, I've been involved in public processes like this for more than 20 years, like everybody else up here. And I have never seen a more inclusive or elaborate public process than this one."

Code, § 11340 et seq.)  The Office of Administrative Law approved the NCC regulations and they became effective on May 1, 2010.

In February 2011, Coastside, United Anglers of Southern California, and Robert C. Fletcher filed an "Amended Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief" (the complaint) challenging the NCC regulations and regulations designating MPAs in the South Coast study region.  At issue in this appeal are the complaint's third cause of action for writ of mandate and fourth cause of action for declaratory and injunctive relief.  Those causes of action challenged the NCC regulations and were asserted by Coastside only.  The trial court bifurcated the claims concerning the NCC regulations from those concerning the South Coast regulations and adjudicated only the former claims.[12]

Regarding the third and fourth causes of action, the court first ruled that Coastside failed to exhaust its administrative remedies provided by Government Code section 11346.9 of the APA.  Although the trial court correctly noted that exhaustion of

_____

[12]  The complaint's first and second causes of action, asserted by United Anglers of Southern California and Fletcher, challenged the South Coast regulations under the MLPA and Improvement Act.  The sixth and seventh causes of action brought by United Anglers of Southern California and Coastside challenged the South Coast regulations under the California Environmental Quality Act (CEQA).  (§ 21000 et seq.)  The fifth cause of action for declaratory and injunctive relief brought by all plaintiffs challenged both the NCC regulations and South Coast regulations on the ground the Commission violated the California Coastal Act  (§ 30000 et seq.) by adopting those regulations without obtaining a coastal development permit.  The court rejected that claim, ruling that designation of MPAs falls within a statutory exception to the permit requirement.  (The court later clarified that it had adjudicated the fifth cause of action as to the NCC regulations only.)  Coastside does not challenge the court's ruling on the fifth cause of action on appeal.

16

administrative remedies is a jurisdictional prerequisite to seeking judicial relief, it proceeded to rule on the substantive issues raised by Coastside.[13]

The court ruled that the Commission had not exceeded its statutory authority in adopting the NCC regulations. The court noted Fish and Game Code section 2861, subdivision (c) (now subdivision (b)), "expressly permits [the Commission] to designate new MPAs prior to a final Master Plan." The court additionally ruled that the Coordinating Committee review process under Public Resources Code sections 36800 and 36900 was not required for the NCC regulations for two reasons. First, the court concluded that "the designation authority contained in [Fish and Game Code] section 1590 is not subject to the Coordinating Committee review process contained in the [Improvement Act] because it exists as a stand-alone statute that is outside the [Improvement Act]." Second, the court concluded that Coordinating Committee review was not required because under Public Resources Code sections 36800 and 36900, the Commission's "rulemaking process involving MPA designations only applies to external MMA proposals from individuals and organizations, not managing and designating entities." Accordingly, the court denied Coastside's petition for writ of mandate and, in doing so, impliedly and necessarily denied Coastside's request for declaratory and injunctive relief under its fourth cause of action. Coastside filed this appeal after

_____

[13]     The court rejected the Commission's arguments that Coastside's claims were barred by the doctrines of estoppel, waiver, and laches.

17

voluntarily dismissing its remaining claims in the fifth, sixth, and seventh causes of action of the complaint.

DISCUSSION

I. *Exhaustion of Administrative Remedies*

Coastside contends the trial court erred in denying Coastside's petition on the ground it failed to exhaust its administrative remedies provided by the APA. The doctrine of exhaustion of administrative remedies requires that " 'administrative remedies be pursued as a jurisdictional prerequisite to seeking judicial relief from an administrative action.' [Citation.] 'In general, a party must exhaust administrative remedies before resorting to the courts. [Citations.] Under this rule, an administrative remedy is exhausted only upon "termination of all available, nonduplicative administrative review procedures." [Citations.]' [Citations.] 'This rule is not a matter of judicial discretion, but rather is a jurisdictional prerequisite.' [Citations.] Moreover, it applies whether relief is sought by a petition for traditional or administrative mandate. [Citation.] ' "[E]xhaustion of administrative remedies furthers a number of important societal and governmental interests, including: (1) bolstering administrative autonomy; (2) permitting the agency to resolve factual issues, apply its expertise and exercise statutorily delegated remedies; (3) mitigating damages; and (4) promoting judicial economy." ' " (*SJCBC, LLC v. Horwedel* (2011) 201 Cal.App.4th 339, 346.) Whether the doctrine of exhaustion of administrative remedies applies in a given case is a legal question that we review de novo. (*Citizens for Open Government v. City of Lodi* (2006) 144 Cal.App.4th 865, 873.)

18

"The APA establishes the procedures by which state agencies may adopt regulations.  The agency must give the public notice of its proposed regulatory action (Gov. Code, §§ 11346.4, 11346.5); issue a complete text of the proposed regulation with a statement of the reasons for it (Gov. Code, § 11346.2, subds. (a), (b)); give interested parties an opportunity to comment on the proposed regulation (Gov. Code, § 11346.8); respond in writing to public comments (Gov. Code, §§ 11346.8, subd. (a); 11346.9); and forward a file of all materials on which the agency relied in the regulatory process to the Office of Administrative Law (Gov. Code, § 11347.3, subd. (b)), which reviews the regulation for consistency with the law, clarity, and necessity (Gov. Code, §§ 11349.1, 11349.3)."  (*Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557, 568.)

Citing *City of Coachella v. Riverside County Airport Land Use Com*. (1989) 210 Cal.App.3d 1277, 1288 for the proposition that " '[a]n administrative remedy exists where the administrative body is required to actually accept, evaluate and resolve disputes or complaints[,]' " the Commission argues that the instant action is barred under the doctrine of exhaustion of administrative remedies because Government Code section 11346.9 required it to hear, evaluate and respond to any challenges brought during the administrative hearings on the proposed NCC regulations, and Coastside actively participated in the rulemaking process without raising any objection to the Commission's procedure or authority to adopt MPAs.[14]

---

[14]    Government Code section 11346.9, subdivision (a)(3), requires an agency's final statement of reasons for adopting, amending, or repealing a regulation to include:  "A summary of each objection or recommendation made regarding the specific adoption,

We have found no authority for the proposition that the public comment and response-to-comment requirements of the APA constitute an administrative remedy that must be exhausted before challenging the validity of an administrative regulation in a judicial action or proceeding. In cases applying the exhaustion doctrine, the administrative procedure in question generally is provided by the statute or statutory scheme under which the administrative agency is exercising the regulatory authority challenged in the judicial action. (See *Rosenfield v. Malcolm* (1967) 65 Cal.2d 559, 566 ["[M]ere possession by some official body of a continuing supervisory or investigatory power does not itself suffice to afford an 'administrative remedy' unless the statute or regulation under which that power is exercised establishes clearly defined machinery for the submission, evaluation and resolution of complaints by aggrieved parties."].) Thus, it is questionable whether the Legislature intended the APA's public comment procedure applicable to agencies in general to constitute an administrative remedy that must be exhausted before challenging the validity of a regulation in a court action.

Assuming, without deciding, that the APA's public comment procedure constitutes an adequate administrative remedy for a claim that an administrative regulation was

---

amendment, or repeal proposed, together with an explanation of how the proposed action has been changed to accommodate each objection or recommendation, or the reasons for making no change. This requirement applies only to objections or recommendations specifically directed at the agency's proposed action or to the procedures followed by the agency in proposing or adopting the action. The agency may aggregate and summarize repetitive or irrelevant comments as a group, and may respond to repetitive comments or summarily dismiss irrelevant comments as a group. For the purposes of this paragraph, a comment is ' irrelevant' if it is not specifically directed at the agency's proposed action or to the procedures followed by the agency in proposing or adopting the action."

adopted without statutory authority, we conclude that the "alternative judicial remedy" exception to the exhaustion requirement allows Coastside to pursue its judicial challenge to the NCC regulations notwithstanding its failure to pursue that administrative remedy. Under the alternative judicial remedy exception, "[t]he exhaustion requirement does not apply . . . if the Legislature indicates its intent to allow judicial relief notwithstanding the failure to exhaust administrative remedies by providing for a judicial proceeding as an alternative to the administrative remedy."  (*Syngenta Crop Protection, Inc. v. Helliker* (2006) 138 Cal.App.4th 1135, 1159-1160.)  The California Supreme Court articulated the exception as follows:  " 'It is . . . well settled that where a statute provides an administrative remedy and also provides an alternative judicial remedy the rule requiring exhaustion of the administrative remedy has no application if the person aggrieved and having both remedies afforded him by the same statute, elects to use the judicial one.' " (*City of Susanville v. Lee C. Hess Co*. (1955) 45 Cal.2d 684, 689.)

Although the Supreme Court referred to the alternative remedies being afforded by the "same statute," cases have applied the alternative judicial remedy exception where the administrative remedy and alternative judicial remedy are provided by different statutes within the same statutory scheme.  (See, e.g., *San Elijo Ranch, Inc. v. County of San Diego* (1998) 65 Cal.App.4th 608, 613-614 [exhaustion doctrine did not preclude city from pursuing judicial remedy to enforce its conditional use permit issued to county for expansion of county's landfill because California Integrated Waste Management Act gives local governmental entities both an administrative and a judicial remedy to enforce their reasonable land use conditions or restrictions on solid waste management facilities];

21

*Muir v. Steinberg* (1962) 197 Cal.App.2d 264, 269-270 [exception applied where administrative remedy and judicial remedy were in different sections of the Water Code].)

The APA provides a judicial remedy as an alternative to challenging the validity of a regulation through the pre-adoption public comment process. Government Code section 11350, subdivision (a), states: "Any interested person may obtain a judicial declaration as to the validity of any regulation or order of repeal by bringing an action for declaratory relief in the superior court in accordance with the Code of Civil Procedure. The right to judicial determination shall not be affected by the failure either to petition or to seek reconsideration of a petition filed pursuant to Section 11340.7[15] before the agency promulgating the regulation or order of repeal. The regulation or order of repeal may be declared to be invalid for a substantial failure to comply with this chapter, or, in the case of an emergency regulation or order of repeal, upon the ground that the facts recited in the finding of emergency prepared pursuant to subdivision (b) of Section 11346.1 do not constitute an emergency within the provisions of Section 11346.1."

Although Government Code section 11350, subdivision (a), specifies that a regulation may be declared invalid for failure to comply with the chapter that comprises the APA or because it was improperly adopted as an emergency regulation, it does not

---

15      Government Code section 11340.7, subdivision (a), provides the right to file "a petition requesting the adoption, amendment, or repeal of a regulation . . . ." Subdivision (c) of section 11340.7 provides the right to "request reconsideration of any part or all of a decision of any agency an any petition submitted."

22

limit a declaratory relief action challenging the validity of a regulation to those grounds. (See *Agnew v. State Bd. of Equalization* (1999) 21 Cal.4th 310, 320 [validity of a Board policy is properly raised through a declaratory relief action under Government Code section 11350].) Because the APA expressly provides the judicial remedy of declaratory relief to challenge the validity of a regulation and does not expressly require that such challenges be first raised during the pre-adoption public comment period, we conclude that bringing a challenge to the validity of a proposed regulation during the public comment period is not a prerequisite to a judicial action.[16] An interested person seeking to challenge the validity of an administrative regulation may pursue either the APA's pre-adoption administrative remedy or the post-adoption judicial remedy provided by Government Code section 11350 or both.[17] Accordingly, Coastside is entitled to a judicial resolution of this matter despite its failure to raise its challenge to the validity of the NCC regulations through the public comment procedure provided by the APA.

---

[16]    In the California Environmental Quality Act (CEQA), the Legislature expressly provided that raising a challenge in a public comment procedure constitutes an administrative remedy that must be exhausted before raising the challenge in a judicial action. Section 21177 provides that no "action or proceeding may be brought pursuant to Section 21167 unless the alleged grounds for noncompliance with this division were presented to the public agency orally or in writing by any person during the public comment period provided by this division or prior to the close of the public hearing on the project before the issuance of the notice of determination." (See *Citizens for Open Government v. City of Lodi*, *supra*, 144 Cal.App.4th at p. 875.)

[17]    The provision in Government Code section 11350, subdivision (a), that the right to declaratory relief is not affected by the failure to petition to repeal or amend the challenged regulation indicates that the Legislature did not intend that exhaustion of administrative remedies be a prerequisite to a declaratory relief action under that statute.

Turning to the merits, we note that although Coastside complains about various aspects of the process that led to the adoption of the NCC regulations, including the role played by the Task Force that was formed under the NCC MOU, its opening brief presents two discrete issues for our determination: (1) whether the Commission had statutory authority to designate MPA's (i.e., adopt the NCC regulations) before the conclusion of the MPLA's master plan process; and (2) whether the Commission lacked statutory authority to adopt NCC regulations without prior review by the Coordinating Committee.

## II. *Commission's Statutory Authority to Adopt the NCC Regulations*

The NCC regulations challenged in this appeal are quasi-legislative regulations because the Commission adopted them in accordance with the Legislature's delegation of the power to make law. (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7, 10 (*Yamaha Corp.*).) Quasi-legislative regulations "have the dignity of statutes." (*Id.* at p. 10.) When a court assesses the validity of a quasi-legislative regulation, the scope of its review is limited to determining whether the regulation is within the law making authority delegated by the Legislature and whether the regulation is reasonably necessary to implement the purpose of the delegating statute. (*Id.* at pp. 10-11.)

Coastside contends that the trial court erred in ruling that Fish and Game Code sections 2589, subdivision (c), and 2861, subdivision (c) (now subdivision (b), authorized the Commission to designate MPAs before completion of the master plan process. Preliminarily, we presume the trial court's reference to Fish and Game Code section

24

2859, subdivision (c), in that context was a clerical error and that the court intended to refer to section 2861, subdivision (c). As noted, former section 2861, subdivision (c), provides: "Nothing in this chapter restricts any existing authority of the department or the commission to make changes to improve the management or design of existing MPAs or designate new MPAs prior to the completion of the master plan." The trial court in its ruling stated: "Fish and Game [Code] section 2861, [subdivision] (c) expressly permits [the Commission] to designate new MPAs prior to a final Master Plan." Later in the same paragraph the court reiterated that Fish and Game Code "section *2859*, [subdivision] (c) expressly confers authority to designate MPAs before the conclusion of the master plan process." (Italics added.) As Coastside points out, Fish and Game Code section 2859, subdivision (c), does not address the Commission's authority to designate MPAs before completion of the master plan process; it provides: "The [C]ommission shall hold at least two public hearings on the master plan and the Marine Life Protection Program prior to adopting the plan and program. The [C]ommission may adopt the plan and the program immediately following the second public hearing or at any duly noticed subsequent meeting." Thus, it appears the court intended to reiterate that subdivision (c) of section 2861 "expressly confers authority to designate MPAs before the conclusion of the master plan process[,]" but mistakenly referred to section 2859 instead of section 2861.

We conclude that the trial court correctly ruled that Fish and Game Code section 2861, subdivision (c), expressly authorized the Commission to designate MPAs before completion of the master plan process. Coastside's argument to the contrary focuses on

25

the qualifying language in section 2861, subdivision (c), that "[n]othing in [the MLPA] restricts *existing authority* of the [DFG] or the [C]ommission to . . . designate new MPAs prior to the completion of the master plan." (Italics added.) Coastside argues that the trial court erred in relying on Fish and Game Code section 1590 as authority to designate new MPAs prior to the completion of the master plan because that statute was not "existing authority" when the Legislature enacted section 2861.[18] We do not construe the phrase "existing authority" in Fish and Game Code section 2861 to mean authority existing at the time the Legislature enacted the MLPA, including section 2861; we construe it to mean authority existing at the time the Commission designates a new MPA. At the time the Commission adopted the NCC regulations, it had "existing authority" to do so under Public Resources Code section 36725 and Fish and Game Code section 1590.

However, even if we were to construe the phrase "existing authority" in Fish and Game Code section 2861, subdivision (c), to mean authority existing when the MLPA was enacted, we would still conclude that section 2861, subdivision (c), authorized the Commission to designate new MPAs before completion of the master plan. When the MLPA (including section 2861), was enacted in 1999, Fish and Game Code section 1580,

---

18    As noted, Fish and Game Code section 1590, authorizes the Commission to "designate, delete, or modify state marine recreational management areas established by the commission for hunting purposes, state marine reserves, and state marine conservation areas, as delineated in [Public Resources Code section 36725] of the [Improvement Act][,]" and Public Resources Code section 36725, subdivision (a), provides that the Commission "may designate, delete, or modify state marine recreational management areas established by the commission for hunting purposes, state marine reserves, and state marine conservation areas."

authorized the DFG, with approval of the Commission, to establish *marine* ecological reserves to protect threatened or endangered marine aquatic organisms or "large heterogeneous natural marine gene pools for the future uses of mankind . . . [,]" and authorized the Commission to "adopt regulations for the occupation, utilization, operation, protection, enhancement, maintenance, and administration of ecological reserves." (Stats. 1993, ch. 667, § 1, p. 3845 (A.B. 521).) Fish and Game Code section 1584 defines "ecological reserve" as "land or land and water areas that are designated as an ecological reserve by the commission pursuant to Section 1580 and that are to be preserved in a natural condition, or which are to be provided some level of protection as determined by the commission, for the benefit of the general public to observe native flora and fauna and for scientific study or research."[19]

Fish and Game Code section 2852, subdivision (c), provides, in relevant part, that an MPA is a marine area "and associated flora and fauna that has been designated by law, administrative action, or voter initiative to protect or conserve marine life and habitat. . . . MPAs are primarily intended to protect or conserve marine life and habitat, and are therefore a subset of marine managed areas (MMAs), which are broader groups of named, discrete geographic areas along the coast that protect, conserve, or otherwise manage a variety of resources and uses, including living marine resources, cultural and

---

[19]    As noted, in 2000, after it enacted the MLPA, the Legislature amended Fish and Game Code section 1580 by deleting references to *marine* ecological reserves and limiting the scope of the statute to terrestrial and nonmarine aquatic ecological reserves. (Stats. 2000, ch. 385, § 3, p. 2388.)

historical resources, and recreational opportunities." Thus, the marine ecological reserves that former Fish and Game Code section 1580 authorized the DFG and the Commission to establish qualify as MPAs within the meaning of the MLPA because their purpose was to protect and conserve marine life and habitat. Because the Commission had "existing authority" when the MLPA was enacted to designate new marine ecological reserves that are substantially equivalent to MPAs as defined in the MLPA, even under Coastside's construction of the phrase "existing authority" in Fish and Game Code section 2861, subdivision (c), the Commission had authority to designate new MPAs for the North Central Coast study region through the NCC regulations before completion of the MPLA master plan.

III. *Applicability of the Requirement of Coordinating Committee Review*

Coastside's main challenge to the NCC regulations is that the Commission was required to comply with the Improvement Act in designating MMAs, but failed to comply with section 36800, which provides that the Coordinating Committee "shall review proposals for new or amended MMAs to ensure that the minimum required information is included in the proposal, to determine those state agencies that should review the proposal, and to ensure consistency with other such designations in the state." It is undisputed that there was no Coordinating Committee review of the MMA proposals that became the NCC regulations. Coastside contends the Commission's failure to comply with the Coordinating Committee requirement of section 36800 renders the NCC regulations void.

28

Coastside first argues that the trial court erred in ruling that Fish and Game Code section 1590 authorized the Commission to designate MMAs as a "stand-alone statute" outside the Improvement Act and, therefore, Coordinating Committee review was not required. We agree that Fish and Game Code section 1590 does not provide "stand alone" authority to designate MMAs outside the Improvement Act. It is well settled that the provisions of a statute may be incorporated by reference and become a part of another statute. (*Greene v. Town of Lakeport* (1925) 74 Cal.App. 1, 9; *Don v. Pfister* (1916) 172 Cal. 25, 27-28; *Palmero v. Stockton Theatres, Inc.* (1948) 32 Cal.2d 53, 58-59 ["[W]here a statute adopts by specific reference the provisions of another statute, regulation, or ordinance, such provisions are incorporated in the form in which they exist at the time of the reference . . . ."].) Fish and Game Code section 1590 expressly authorizes the Commission to designate marine recreational management areas, state marine reserves, and state marine conservation areas[20] "*as delineated in subdivision (a) of Section 36725 of the Public Resources Code.*" (Italics added.) The quoted language of Fish and Game Code section 1590 clearly incorporates Public Resources Code section 36275, subdivision (a), by reference. "To 'delineate' means ' . . . to describe in detail, esp. with sharpness or vividness' [citation]; '. . . to describe, portray, or set forth with accuracy or in detail.' " (*Sequoia Ins. Co. v. Superior Court* (1993) 13 Cal.App.4th 1472, 1480.) Accordingly, we construe the language in Fish and Game Code section 1590 giving the

---

[20]    State marine recreational management areas, state marine reserves, and state marine conservation areas all fall within the definition of "marine managed area" set forth in section 36602, subdivision (d).

29

Commission the authority to designate MMAs "as delineated in subdivision (a) of Section 36725" to mean that the Commission's authority to designate MMAs is whatever authority is described and set forth in section 36275, subdivision (a), which is part of the Improvement Act. It follows that any statutory limits, qualifications, or conditions that apply to the Commission's designating authority under Public Resources Code section 36725, subdivision (a), apply equally to the Commission's designating authority under Fish and Game Code section 1590. This point is underscored by Fish and Game Code section 1591, subdivision (b), which provides that "[s]tate marine recreational management areas established by the commission for hunting purposes, state marine reserves, and state marine conservation areas *shall be designated, deleted, or modified by the commission pursuant to [the Improvement Act]. The restrictions and allowable uses applicable to those areas are as set forth in that act*."[21] (Italics added.)

Thus, resolution of the issue of whether the Commission adopted the NCC regulations in excess of its statutory authority under section 36725, subdivision (a), turns on whether the requirement of Coordinating Committee review under section 36800 applies to the proposed MMAs that became the NCC regulations and, if so, whether it was a mandatory requirement. We conclude that Coordinating Committee review under section 36800 was not required for MMA proposals that became the NCC regulations and, therefore, the Commission acted within its statutory authority in adopting them.

---

[21] Subdivision (a) of section 1591 of the Fish and Game Code refers to the Improvement Act.

30

In construing section 36800 and related statutes, we are mindful that " 'an individual statute must be construed in the context of the comprehensive statutory scheme of it is a part. Statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible. Where uncertainty exists, appellate courts must construe provisions in a reasonable, common sense fashion taking into consideration the practical consequences that will flow from a particular interpretation.' " (*Wirth v. State of California* (2006) 142 Cal.App.4th 131, 140.)

As noted, section 36800 provides that the Coordinating Committee "shall review *proposals* for new or amended MMAs to ensure that the minimum required information is included in the proposal, to determine those state agencies that should review the proposal, and to ensure consistency with other such designations in the state. The committee shall also serve to ensure the proper and timely routing of site proposals, review any proposed site-specific regulations for consistency with the state system as a whole, and conduct periodic reviews of the statewide system to evaluate whether it is meeting the mission and statement of objectives." (Italics added.)

Section 36900 provides: "*Individuals or organizations may submit a proposal to designate an MMA* directly through the [Coordinating Committee] or an appropriate designating entity. Proposals submitted to a designating entity shall be forwarded to the committee to initiate the review process." (Italics added.) Section 36870 provides that "[o]n or before January 1, 2002, the committee shall establish a standard set of instructions for each classification to guide *organizations and individuals in submitting*

31

*proposals* for designating specific sites or networks of sites.  On or before January 1, 2003, the relevant site proposal guidelines shall be adopted by each designating entity. [¶] (a) At a minimum, each proposal shall include the following elements for consideration for designation as an MMA: [¶] (1) *Name of individual or organization proposing the designation*."  (Italics added.)  Section 36870, subdivision (b) provides:  "The following elements, if not included in the original proposal, *shall be added by the proposed managing agency in cooperation with the individual or organization making the proposal*, prior to a final decision regarding designation . . . ."  (Italics added.)  Section 36900, subdivision (a), reiterates that the Coordinating Committee "shall review proposals to ensure that the minimum required information is included in the proposal, to determine those state agencies that should review the proposal, and to ensure consistency with other such designations of that type in the state."

Reading section 36800 and 36900 in the context of the entire scheme of which they are a part, we conclude that section 36900 specifies which MMA proposals must be sent to the Coordinating Committee (proposals prepared by individuals and organizations), and section 36800, along with section 36900, subdivision (a), directs what the Coordinating Committee is required to do with those proposals.  In other words, section 36800 provides simply that the Coordinating Committee shall review proposals, and section 36900 specifies that the proposals subject to its review will be those submitted by individuals and organizations.

Further, we construe the terms "individuals" and "organizations" as used in the statutory scheme as referring to individuals and organizations outside of the group of

32

state agencies that are involved in the MMA designation process under the Improvement Act, such as the Commission, the DFG, the Resources Agency, the Department of Parks and Recreation, and the State Water Resources Control Board. The fact that section 36800 requires the Coordinating Committee to determine which "state agencies" should review a proposal indicates that the statute contemplates proposals coming to the Coordinating Committee from outside persons or organizations rather than from state agencies. Section 36870 requires the Coordinating Committee to "establish a standard set of instructions for each classification to guide organizations and individuals in submitting proposals[,]" and section 36870, subdivision (a), requires proposals to state the name of the "individual or organization proposing the [MMA] designation." If the Legislature intended that MMA proposals from state agencies be subject to Coordinating Committee review, it presumably would have required that a proposal identify the individual, organization, *or agency* making the proposal.

Section 36870, subdivision (b), provides that certain "elements, if not included in the original proposal, *shall be added by the proposed managing agency in cooperation with the individual or organization making the proposal*, prior to a final decision regarding designation . . . ." (Italics added.) This provision shows that the Legislature distinguished managing agencies from individuals or organizations making proposals and intended that the role of a managing agency in the Coordinating Committee review process is to assist individuals or organizations in making proposals that meet the standards set forth in section 36870.

33

Coastside argues that even if Coordinating Committee review is required only for proposals from individuals and organizations and not for proposals from managing agencies or designating entities, Coordinating Committee review was required for the NCC regulations because they were proposed by the Task Force and not by DFG or the Commission. Coastside contends the Task Force was neither a designating entity nor a managing agency and therefore was either an "individual" or an "organization" under the Improvement Act. The Commission contends that the Task Force was not an external individual or entity, but was an arm of the DFG.

We conclude that the proposal the Commission adopted as the NCC regulations is properly viewed as a proposal from the DFG and the Resources Agency rather than one from an outside organization. The Secretary of the Resources Agency appointed the members of the Task Force under the NCC MOU, and the NCC MOU recited that the DFG sought to obtain the assistance of the Resources Agency and RLF in preparing the alternative MPA proposals for the North Central Coast study region. Under the NCC MOU, the DFG played an extensive role in developing those proposals, including participating in the appointment of the Regional Stakeholders Group; appointing a Science Advisory Team; fully participating in the deliberations of the Task Force, Science Advisory Team and Regional Stakeholders Group and sharing its analysis and concerns regarding MPA proposals; assigning key personnel to assist in achieving the objectives of the MOU; providing the Task Force, Science Advisory Team and Regional Stakeholders Group a statement of feasibility criteria that the DFG would use in analyzing site alternatives for the second phase of the MLPA process; participating as a

member of a steering committee to guide the flow of work required to achieve the objectives and commitments of the NCC MOU and providing provide staff support for the Science Advisory Team and the Regional Stakeholders Group; advising the Commission on the alternative MPA proposals and the Task Force's recommendation to the Commission for a preferred MPA alternative proposal; and making available to the Task Force and Science Advisory Team any public data and other technical resources within the possession of the DFG that are relevant to marine conservation and that are useful to help complete the objectives of this MOU. In short, the Task Force was a creation of the Resources Agency that operated on behalf of the Resources Agency and in partnership with the DFG to prepare alternative MPA proposals to present to the Commission. In doing so, it was performing governmental functions and was not acting as an outside entity presenting proposals to the Commission. Because the Task Force was not the type of outside organization contemplated by sections 36870 and 36900, its proposals that became the NCC regulations were not subject to Coordinating Committee review.

Even if we were to decide that section 36800 required Coordinating Committee review for the proposed NCC regulations, we would uphold the regulations notwithstanding the Commission's failure to comply with section 36800 because we conclude the statutory requirement of Coordinating Committee review is directory rather than mandatory. The "mandatory-directory" distinction is different from the distinction between mandatory and *permissive* statutory provisions. (*Galbiso v. Orsosi Public Utility Dist.* (2010) 182 Cal.App.4th 652, 664.) In the context of the dichotomy between

35

mandatory and *permissive* statutory provisions, " 'the term "mandatory" refers to an obligatory [procedure] which a governmental entity is required to [follow] as opposed to a permissive [procedure] which a governmental entity may [follow] or not as it chooses. By contrast, the "directory" or "mandatory" designation does not refer to whether a particular statutory requirement is "permissive" or "obligatory," but instead simply denotes whether the failure to comply with a particular procedural step will or will not have the effect of invalidating the governmental action to which the procedural requirement relates.' " (*People v. McGee* (1977) 19 Cal.3d 948, 958-959.)  " '[Many] statutory provisions which are "mandatory" in the obligatory sense are accorded only "directory" effect.' " (*Id.* at p. 959.)

If a failure to comply with a statutory requirement "is determined to have an invalidating effect, the statute is said to be mandatory; if the failure is determined not to invalidate subsequent action, the statute is said to be directory.  . . . [I]n evaluating whether a provision is to be accorded mandatory or directory effect, courts look to the purpose of the procedural requirement to determine whether invalidation is necessary to promote the statutory design." (*People v. McGee*, *supra*, 19 Cal.3d at p. 958.)  " 'If the procedure is essential to promote the statutory design, it is "mandatory" and noncompliance has an invalidating effect.  If not, it is directory.' " (*City of Santa Monica v. Gonzalez* (2008) 43 Cal.4th 905, 924.)  "[A] finding that the procedure is mandatory generally follows where the protection of individuals is involved; however, where the object or purpose is merely to secure the orderly conduct of business, a finding that the procedure is directory is the usual result." (*Thomas v. Shewry* (2009) 170 Cal.App.4th

36

1480, 1487.)  "When the object is to subserve some public purpose, the provision may be held directory or mandatory as will best accomplish that purpose . . . ." ' "  (*People v. McGee*, at p. 962, italics omitted.)

The word "shall" in a statute does not necessarily denote a mandatory requirement; it may be construed as directory or permissive.  (*Fort Emory Cove Boatowners Assn. v. Cowett* (1990) 221 Cal.App.3d 508, 532.)  "Whether a statute is mandatory or directory depends on the legislative intent as ascertained from a consideration of the entire act."  (*Ibid.*; *People v. Lara* (2010) 48 Cal.4th 216, 227.)  "When a statute does not provide any consequence for noncompliance, the language should be considered directory rather than mandatory."  (*In re C.T.* (2002) 100 Cal.App.4th 101, 111; *People v. Lara*, at p. 227 [The Legislature's failure to include a penalty or consequence for noncompliance with a statutory procedure indicates a directory rather than mandatory requirement.].)  Further, in the absence of prejudice, lack of strict compliance with a statute does not render subsequent proceedings void.  (*In re Katelynn Y.* (2012) 209 Cal.App.4th 871, 880; *Crane v. Board of Supervisors* (1936) 17 Cal.App.2d 360, 368 [statutory requirement is directory when noncompliance results in no injury or prejudice to the substantial rights of interested persons].)

There is no penalty or consequence in the Improvement Act for a designating entity's adoption of an MMA proposal as a regulation without first subjecting the proposal to Coordinating Committee review under section 36800.  The absence of such penalty or consequence supports our view that the Coordinating Committee review requirement is directory rather than mandatory.

37

Looking to the purpose of Coordinating Committee review, we conclude that invalidating the NCC regulations is not necessary to promote the statutory design. As stated in section 36800 (and reiterated in section 36900, subdivision (a)), the purpose of Coordinating Committee review of MMA proposals is "to ensure that the minimum required information is included in the proposal, to determine those state agencies that should review the proposal, and to ensure consistency with other such designations in the state." The Coordinating Committee is also responsible for ensuring that existing MMAs are reclassified in accordance with the Improvement Act (§ 36750), establishing standard instructions for each of the six MMA classifications defined in section 36700 to guide organizations and individuals in submitting MMA proposals (§ 36870), and forwarding MMA proposals to a scientific review panel to be established by the Secretary of the Resources Agency (§ 36900, subds. (a) & (b)).

The NCC regulations adhere to the classification system mandated by the Improvement Act,[22] and there is no dispute as to whether the Integrated Preferred Alternative proposal that the Commission adopted as the NCC regulations complied with the requirements for proposals set forth in section 36870. The Coordinating Committee function of determining which state agencies should review the proposal was unnecessary to achieve the objective of interagency coordination in the adoption of the NCC

---

[22]    An attachment to the DFG's revised draft master plan listed designation criteria for various types of MMAs and noted that "[p]ursuant to statute, these designation criteria have been developed by the State Interagency Coordinating Committee for Marine Managed Areas to assist individuals or groups in developing site proposals."

regulations, because the involvement of interested agencies—both state and federal—was built into the NCC MOU process. The NCC MOU stated that the Resources Agency sought "to ensure comprehensive and coordinated management, conservation and enhancement of California's ocean resources for their intrinsic value and for the benefit of current and future generations[,]" and would "provide state policy leadership and direction, including coordination with state agencies in furtherance of the state commitments made in this MOU." As noted, under the NCC MOU, the DFG was extensively involved in the development of the Integrated Preferred Alternative proposal adopted by the Commission. The administrative record reflects that the Department of Parks and Recreation also supported and provided substantial input into the Integrated Preferred Alternative proposal, and that the proposal was supported by numerous other public agencies, including the Coastal Commission and the federal Bureau of Land Management. The Regional Stakeholders Group, which was extensively involved in the NCC MOU process, included representatives from state and federal agencies as well as private entities.

The adoption of the NCC regulations satisfied the Coordinating Committee objective of ensuring consistency with other MMA designations in the state because the NCC regulations were developed as one of five phases of an overall MLPA master plan for the entire state prepared through the MLPA Initiative. Finally, the requirement under section 36900 of scientific review after Coordinating Committee review was substantially met as to the NCC regulations. Under the NCC MOU, the DFG appointed a "Science Advisory Team," whereas under section 36900, subdivision (b), the Secretary of the

Resources Agency is responsible for establishing a "scientific review panel" to evaluate MMA proposals. This deviation in the NCC MOU from the statutory procedure is insignificant and does not warrant invalidating the NCC regulations. The MLPA Initiative provided: "The charge to the [Science Advisory Team] is to provide the scientific knowledge and judgment necessary to assist the [DFG] with: (1) meeting the objectives of the MLPA Initiative, (2) providing input to the [Task Force], and (3) completing the north central coast portion of the California Master Plan for MPAs. Principally, the [Science Advisory Team] is charged with reviewing and commenting on scientific papers relevant to the implementation of the MLPA, reviewing alternative MPA proposals, reviewing draft master plan documents, addressing scientific issues presented by those documents, and addressing scientific questions raised by the [Task Force] or stakeholders." The function of the scientific review panel under section 36900 is "to evaluate proposals for technical and scientific validity, including consideration of such things as site design criteria, location, and size." (§ 36900, subd. (b).) The Science Advisory Team's involvement in the development of MMA proposals through the NCC MOU process sufficiently satisfied the requirement of scientific review under section 36900.

Thus, we conclude that invalidating the NCC regulations on the ground they did not undergo pre-adoption Coordinating Committee review under section 36800 is not necessary to promote the statutory purpose of such review, or the broader statutory objectives of implementing a coordinated network of MPAs and MMAs (Fish & G. Code, § 2853, subd. (b)(6)); Pub. Resources Code, § 36601). As noted, when the object

40

of a statutory provision is to serve a public purpose, "the provision may be held directory or mandatory as will best accomplish that purpose. . . ." ' " (*People v. McGee*, *supra*, 19 Cal.3d at p. 962, italics omitted.) The ultimate object of Coordinating Committee review under section 36800 is to further the Improvement Act's broader goal of implementing a coordinated and consistent system of MMAs for the public good. In our view, this public purpose of the Improvement Act and the related public purposes of the MLPA are far better served by our holding the Coordinating Committee review requirement to be directory than they would be if we were to hold the NCC regulations are invalid on the ground they were not subjected to Coordinating Committee review before adoption.

The NCC regulations are the product of years of hard work by a multitude of interested persons, agencies, and organizations to accomplish the Improvement Act's mission of ensuring "the long-term ecological viability and biological productivity of marine and estuarine ecosystems and to preserve cultural resources in the coastal sea, in recognition of their intrinsic value and for the benefit of current and future generations[,]" (§ 36620), and the MLPA's objective of creating a system of MPAs that are "designed and managed according to clear, conservation-based goals and guidelines that take full advantage of the multiple benefits that can be derived from the establishment of marine life reserves." (Fish & G. Code, § 2851, subd. (h).) We are satisfied that the NCC regulations accomplish these broad public purposes of the MLPA and Improvement Act. Considering the enormous investment of time and effort by so many that went into their creation, we are loathe to hold the NCC regulations invalid and undo the arduous process that resulted in their adoption absent a compelling reason to do so. We find no such

41

reason and conclude the trial court correctly ruled that the Commission acted within its statutory authority in adopting the NCC regulations.

## IV.  *Evidentiary Issues*

Coastside contends the trial court committed reversible error by excluding evidence that it unsuccessfully challenged the South Coast regulatory process on the same grounds it asserts in this action as to the NCC regulations.  Coastside argues the excluded evidence was relevant to show that it was excused from any requirement to exhaust its administrative remedies before filing this action because it would have been futile to pursue them.  (See *Unnamed Physician v. Board of Trustees* (2001) 93 Cal.App.4th 607, 620.)  Because we have determined that the doctrine of exhaustion of administrative remedies does not apply in this case, this issue is moot and we need not address it.

Coastside also contends the trial court erroneously excluded evidence that in another action relating to the MLPA filed in Sacramento County Superior Court (the Sacramento action), the Commission took the position that the Task Force is not a state agency and, therefore, was not required under the Public Records Act (Gov. Code, § 6250 et seq.) to produce documents the plaintiff Robert Fletcher requested in that action.  As noted, Fletcher was also a plaintiff (but is not an appellant) in the present action.

We review rulings on the admissibility of evidence for abuse of discretion.  (*Dart Industries, Inc. v. Commercial Union Ins. Co.* (2002) 28 Cal.4th 1059, 1078.)  However, even if the trial court improperly excluded evidence, the error does not require reversal unless the appellant shows the ruling was prejudicial—i.e., that it is reasonably probable

the appellant would have obtained a more favorable result absent the error. (*Saxena v. Goffney* (2008) 159 Cal.App.4th 316, 332.)

We find no abuse of discretion in the trial court's decision to exclude evidence of the position taken by the Commission in the Sacramento action. It was proper for the court to base its decision regarding the status of the Task Force solely on the argument and evidence before it in this case, and to not consider argument presented in a different context in a separate superior court action. Even if we were to decide it was an abuse of discretion to exclude the evidence, we would not find the exclusion prejudicial. The trial court took judicial notice of the order in which the Sacramento court ruled that the Task Force is a state agency within the meaning of the Public Records Act. It is clear from the text of that order that the Commission's position in the Sacramento action on the governmental status of the Task Force was the opposite of its position in this case, and that Fletcher's position on that issue in the Sacramento action is the opposite of Coastside's position in this case. Because the trial court was aware of the Commission's position in the Sacramento action from the order it judicially noticed, it is not reasonably probable that the court would have ruled differently on the issue of the Task Force's status if it had admitted additional evidence of the argument the Commission presented to trial court in the Sacramento action. In any event, regardless of how the trial court might have ruled on the status of the Task Force had it admitted the evidence in question, in light of our conclusion that the Task Force is not a private entity or nongovernmental organization, the court's exclusion of that evidence cannot be deemed prejudicial.

43

## V. *Request for Judicial Notice*

Coastside requests that we take judicial notice of the following materials: two fiscal summaries—one from the state Assembly Committee on Appropriations and one from the state Senate Appropriations Committee—concerning Assembly Bill No. 993, the bill to establish the MLPA; four documents posted on the DFG's Web site that concern implementation of the MLPA in the San Francisco Bay study region (the 5th and final study region in the phased implementation of the MPLA); the Commission's "Final Statement of Reasons for Regulatory Action" regarding its adoption of MPAs for the South Coast study region; and an "Enrolled Bill Report" for Assembly Bill No. 2800, the bill to establish the Improvement Act. We deny the request for judicial notice because the materials in question are either irrelevant or unnecessary to our resolution of the issues raised on appeal. (*Hughes Electronics Corp. v. Citibank Delaware* (2004) 120 Cal.App.4th 251, 266; *County of San Diego v. State of California* (2008) 164 Cal.App.4th 580, 613, fn. 29.)

## DISPOSITION

The order denying Coastside Fishing Club's petition for writ of mandate is affirmed.  The parties shall bear their own costs on appeal.

O'ROURKE, J.

WE CONCUR:

McCONNELL, P. J.

IRION, J.