Filed 9/30/22 In re T.P. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

|  |  |
|---|---|
| In re T.P., a Person Coming Under the Juvenile Court Law. | D080037 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>K.P.,<br><br>    Defendant and Appellant. | (Super. Ct. No. J520819) |

APPEAL from an order of the Superior Court of San Diego County, Rohanee Zapanta, Judge. Affirmed.

Monica Vogelmann, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of County Counsel, Caitlin E. Rae, Chief Deputy, and Eliza Molk, Senior Deputy Counsel, for Plaintiff and Respondent.

Nine-year-old T.P. came to the attention of the San Diego County Health and Human Services Agency (Agency) on July 21, 2021, when it received a report from Rady Children's Hospital (RCH) that T.P.'s mother K.P. (Mother) had abruptly left the emergency room with T.P. against medical advice. Doctors had determined T.P. was " 'very close' " to being in diabetic ketoacidosis, a life-threatening condition caused by untreated, excessively high blood sugar. The following day, when Mother continued to refuse emergency medical treatment for T.P., Agency, with the assistance of law enforcement, contacted T.P. at his home and over Mother's objection, arranged for his transfer by ambulance to RCH, where he was admitted. During T.P.'s hospitalization, Agency filed a petition on his behalf under Welfare and Institutions Code section 300, subdivision (b) based on medical neglect.[1]

At the subsequent contested adjudication-disposition hearing held on December 20, the juvenile court ordered Mother and T.P.'s father, Anthony R. (Father), to share legal custody of T.P., Father to have sole physical custody, and Mother to have supervised visitation. At the time of the hearing Mother was facing criminal charges for felony child abuse and was the subject of a criminal protective order (CPO) resulting from the July incident. The court terminated jurisdiction, dismissed the dependency proceeding and issued exit orders.

---

[1]    All further statutory references are to the Welfare and Institutions Code.

On appeal Mother challenges only the visitation portion of the juvenile court's exit orders, contending that one or more of the Agency social workers were biased against her and the court abused its discretion by requiring that Mother's contacts with T.P. remain supervised. We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

On or about July 15, 2021, Mother took T.P. to consult with a pediatrician after T.P. had experienced abnormal weight loss.[2] Initial lab results showed T.P.'s blood glucose level was "very high." At a follow-up appointment on the morning of July 21, T.P. appeared lethargic and dehydrated, and was breathing deeply. After additional medical tests and consultation with an endocrinologist, paramedics transported T.P. to the RCH emergency room. Despite warnings from at least two doctors and several nurses that T.P.'s condition was "dangerous," Mother determined T.P. did not need to be admitted. Mother explained she could manage T.P.'s care at home, claiming both she and maternal grandmother S.S. (Grandmother) were "nurses" and that T.P. had a follow-up visit with his pediatrician the next morning.

After Mother left with T.P., RCH doctors attempted to contact Mother by phone and later that evening an RCH doctor spoke with Grandmother. She stated that T.P.'s glucose numbers were down and the child was fine. During their conversation, Grandmother seemed unconcerned about T.P.'s condition.

---

[2]   It is not clear from the record how many times T.P. consulted with this pediatrician—or any doctor—prior to his July 15 appointment. During an Agency interview, Mother reported that, prior to T.P.'s rapid weight loss of about 40 pounds over about a two-month period, he was about 100 pounds overweight.

That same evening, Agency received a report on its hotline from RCH that Mother had left the emergency room with T.P. against medical advice while he was being admitted. The reporter also expressed concern that two unused vials of insulin were missing from T.P.'s bedside at the same time he and Mother left RCH, which, if administered improperly, "could be fatal" to T.P.

San Diego County Sheriff's deputies attempted to conduct a welfare check of T.P. at his family home in the evening of July 21. Deputies contacted Grandmother, who resided in the home with Mother and T.P. Grandmother refused to open the front door and reported Mother and T.P. were not home.

The next day, Agency spoke with a RCH child abuse specialist who confirmed that, based on T.P.'s labs from the day before, he was "very close" to becoming acidotic and needed to be seen by medical personnel immediately. The doctor also reported that T.P. was a no-show for a morning follow-up medical appointment. Agency requested deputies meet a social worker at T.P.'s family home to secure the child and ensure he received appropriate medical care.

At about 11:30 a.m., an Agency social worker and deputies contacted Grandmother at the family home. She refused to open the front door, stating she was elderly and in a wheelchair, that Mother and T.P. were not home, and that T.P. was "fine and there was nothing wrong with him." Calls to Mother's cellphone went straight to voicemail.

In the early afternoon, the social worker and multiple deputies returned to the family home. Once again Grandmother would not open the front door and claimed Mother and T.P. were away. Following about 30 minutes of negotiations with Grandmother, Mother finally came to the door

4

and allowed deputies and the social worker to see T.P. through a nearby window.  T.P. appeared pale, sweaty, and scared.

Deputies continued to negotiate with Mother, explaining that T.P. needed to go to the hospital immediately.  After about 30 more minutes, T.P. came outside.  Paramedics told Mother they were transporting him to the RCH emergency room.  Mother refused to consent to treatment if T.P. was taken to RCH, instead insisting he be taken to a hospital in Coronado despite its lack of a pediatric unit.  Once at the Coronado hospital, doctors determined that T.P. was in full ketoacidosis and requested his immediate transfer to RCH.

During T.P.'s admission to RCH at night on July 22, Mother reported "her emotions . . . [got] the best of her" the day before when she left with T.P. against medical advice.  She nonetheless repeatedly refused to sign Agency's safety plan that provided she would not remove T.P. from RCH until discharged by his doctors.

Agency interviewed T.P. in Mother's presence while he was hospitalized.  The social worker noted T.P. was articulate, smart, and polite.  T.P. reported he and Mother left RCH on July 21 because Mother had told him the hospital "wasn't safe."  He further reported being homeschooled by Mother, not having "any friends in real life," and playing online video games to make friends.  He also reported being scared the day before he went to the hospital (i.e., July 20) because he felt like he "was going to die."

In an interview with Mother during T.P.'s hospitalization, Mother explained she left RCH because the hospital had given him insulin without her consent, and nobody from RCH had checked on T.P. for hours.  Mother reported nurses and a doctor attempted to stop her from leaving with T.P.

5

Mother nonetheless demanded the IV be removed from her son's arm, claiming T.P. was "fine" and that she could manage his care at home.

Mother told the interviewer she received an "LPN"—the equivalent of an LVN in California—about 10 years earlier while living in Minnesota, and worked in that capacity for about 18 months until she became pregnant with T.P. Mother claimed to have been in the backyard in the evening of July 21 when deputies initially conducted a welfare check of T.P. She denied taking the missing insulin vials; alleged one of the RCH nurses/doctors had been "under the influence" when she left the emergency room with T.P.; and claimed T.P. had not missed his July 22 doctor's appointment because the pediatrician's office had canceled it.

Mother declined the Agency's request that she provide information about Father and reported Father was not in T.P.'s life.

On July 26, Agency obtained a protective custody warrant for T.P. due to his imminent discharge from RCH. Agency determined the warrant was necessary because it was concerned that Mother would not participate in follow-up care of T.P., putting his health at substantial risk.

Agency filed a section 300, subdivision (b) dependency petition on July 28, alleging T.P. has suffered, or there was a substantial risk he would suffer, serious physical harm or illness due to the willful or negligent failure of Mother to provide him with adequate medical treatment.

### *Juvenile Court Proceedings*

### A. Detention and Disposition

Agency's July 29 detention report recommended T.P. be detained outside Mother's home, and she have supervised visitation and receive reunification services. The Agency also recommended against voluntary

services and sought court intervention to ensure T.P.'s follow-up medical needs would be met.

Following the hearing, the juvenile court denied Mother's request that T.P. be returned to her care. It also denied her alternative requests for unsupervised visitation, and that T.P. receive a second medical opinion because of her continued belief he was receiving inadequate care at RCH. The court detained T.P. in out-of-home care; ordered Mother to disclose the contact information for Father; and set the jurisdictional and dispositional hearing for August 19.

## B. Jurisdiction-Disposition Report

In its lengthy jurisdiction-disposition report, Agency recommended the juvenile court make a true finding on the section 300, subdivision (b) petition; T.P. continue living outside the family home; Mother and Father have supervised visitation with T.P.; and Mother be offered reunification services. At the time of the report, T.P. was living in a confidential licensed foster home with caregivers Tara and Erik.

Agency located Father after Mother provided his contact information and a copy of a judgment of paternity from a Missouri court, family support division. The judgment established T.P. was Father's biological son and ordered Father to pay child support.

During a telephone interview, Father told Agency he lives in Missouri and that he had had contact with T.P. for a few years when the child was born but had not had any contact with T.P. for the past five years due in part to Mother. Father had been contemplating legal action to regain contact and visitation with T.P. when Mother notified Father of the dependency proceeding.

Father indicated he had an "Army of support" in Missouri, as he was from a "large Sicilian family" and many of his relatives lived nearby. Father was employed and lived in a nice home across the street from a park. Father wanted to do what was "best" for T.P.; to take custody of T.P. and have the child live with him in Missouri and attend school in-person; and to ensure T.P. received proper medical care.

Agency also conducted a follow-up interview with Mother, who was accompanied by Grandmother. Mother wanted Father assessed as a potential placement for T.P. Mother added she had spoken to Father about her decision, and wanted him to participate in the upcoming Child and Family Team (CFT) meeting and to take custody of T.P. Mother explained Father had not been involved in T.P.'s life for the last five years primarily because of where Father lived. During the interview both Mother and Grandmother repeatedly complained that T.P.'s needs were not being met by his caregivers; and both blamed RCH for failing to provide T.P. with proper medical care.

Agency also interviewed T.P.'s caregivers. Tara reported that during an August 4 supervised visit Mother had repeatedly checked T.P.'s blood sugar level and had given him a food item that was not included on his doctor-approved meal plan. The caregivers had recently taken T.P.'s cellphone away because he was messaging and calling Mother "all the time."

Tara also reported T.P. attended in-person school for the first time on August 12 and that it had gone " 'very, very well.' " Despite the myriad complaints of Mother and Grandmother during the August 16 CFT meeting, T.P. was thriving; his medical condition was stable; he spoke with a diabetes specialist every three days; and he no longer excessively worried about "everything."

8

Agency also followed up with a doctor from RCH after Mother stated T.P. should not attend in-person school because he allegedly was "immunocompromised." The doctor reviewed T.P.'s medical records and reported there was no evidence he suffered from an immune deficiency. The doctor opined that T.P. instead suffered from "[m]edical [c]hild [a]buse," "psychiatric abuse," and "[e]ducation neglect" by Mother; and that Mother had let T.P. starve for months without seeking medical care, which in the doctor's view met the criterion for "torture." The doctor recommended T.P. undergo a court-ordered forensic examination.

The Agency's August 19 report also summarized some of the supervised telephone visits between Mother and T.P. During many of these calls, Mother gave T.P. medical advice, even after being repeatedly directed not do so. After one of the calls with only an Agency social worker remaining on the line, Mother complained T.P. did not want to attend in-person school and claimed he was not well enough to do so. Mother asked Agency to find T.P. a new placement if his current caregivers were unable to facilitate remote learning.

Agency concluded that Mother appeared unable to prioritize T.P.'s health and well-being "over her need to facilitate his care and medical treatment." "There is continued concern regarding the mother's ability to meet [T.P.'s] medical needs while also supporting him psychologically and emotionally." "The mother and grandmother's care of [T.P.] appear to be strongly influenced by a predisposition [to] health issues/diagnoses he has never been assessed for or diagnosed with. In addition, whether or not medical care is sought and/or considered appropriate for [T.P.] is significantly based on the mother and grandmother's assessments per their reported nursing degrees/licensure."

9

Over Mother's objection, the juvenile court ordered that T.P. undergo a forensic examination to ensure he had no other underlying medical and/or mental health issues, as Mother repeatedly claimed. Also over Mother's objection and with the consent of T.P.'s counsel and Father's counsel, the court authorized T.P. to receive "standard vaccinations" that would allow him to continue attending in-person school. The court also limited Mother's ability to make educational and developmental decisions on T.P.'s behalf, and added Father, along with T.P.'s caregivers, as the decision-makers for the child. At Mother's request, the court set a contested adjudication-disposition hearing for November 19.

## C. Special Hearing

On September 23, Agency filed a request for special hearing asking the juvenile court to detain T.P. with Father in Missouri. At that time, Mother was facing arraignment on charges of felony child abuse and the District Attorney's Office was seeking a CPO against her as a result of the July 21 incident.

In its September 30 Addendum Report, Agency noted that since its involvement in July 2021, "very little" had changed with regard to Mother's "perception of the protective issues, her erratic behaviors, or her interactions with [T.P.] The Agency has continued to observe and assess the mother over the past months and she has given the Agency no reason to believe that if [T.P.] were returned to her care, he would be safe and his medical needs would be met. Since [T.P.] was placed in foster care and his diabetes has been consistently managed, he is doing extremely well."

Regarding Father, Agency reported he had remained in "constant contact" with social workers, T.P., and T.P.'s caregivers; and had "made himself available, complied with any request, and ha[d] mad[e] active efforts

to establish a strong network of support, educate himself on diabetes, and seek additional resources of education related to diabetes." Father appeared "eager and anxious" to become T.P.'s full-time parent, and T.P. was "just as eager to return home with his father."

Agency recommended the juvenile court make a true finding on the section 300, subdivision (b) petition, place T.P. with Father and allow them to return to Missouri, issue exit orders for Mother and Father, and terminate jurisdiction.

In support of its recommendation, Agency noted Father had about 28 immediate family members living nearby who would "love, nurture and support [T.P.]" T.P. described supervised video visits between him and Father as "great" and expressed a desire to meet his dad. Caregiver Tara, who supervised the visits, commented that T.P. and Father appeared to be "exactly the same person."

During this reporting period, T.P. underwent a court-ordered forensic examination at RCH. The doctor reported T.P. "looked great" and, much to T.P.'s relief, that he was "extremely healthy" other than being diabetic. The doctor confirmed T.P. was neither immunocompromised, as Mother had claimed, nor was "wasting away," as Mother (and Grandmother) also had claimed. During the examination, T.P. told the doctor he was "pumped about living with his father."

Agency's September 30 Addendum Report included a summary of a conversation between Tara and T.P. after a supervised telephone visit between T.P. and Mother on September 8. After this call ended, T.P. confided he felt "guilty" telling Mother he had gone to a water park and had "fun." T.P. also did not want Mother to know "he was out and about and doing things because of how his mom responded to an illness." Tara observed T.P.

11

was "completely different" when talking with Father, as T.P. told him all the fun things he did. Tara noted Father encouraged T.P. to "have fun," as did his caregivers.

On September 10, the caregivers requested T.P. be transferred to a new placement after Mother had called T.P.'s school seeking his "records and information," which caused Tara to feel unsafe as Mother was "overstepping." Two days later, the caregivers requested Agency expedite T.P.'s new placement after law enforcement conducted a welfare check of T.P. at the caregivers' home. According to police records, the (anonymous) reporting party claimed T.P. had a " 'broken nose, black eye and scratches on him.' " The officers documented T.P. " 'was in pristine physical condition,' " the caregivers' home was " 'orderly and neat,' " and the caregivers were " 'more than cooperative' " during the check. When first contacted by police, T.P. was doing his homework and (rhetorically) asked, " '[O]h no, what did my mom do now?' "

After police left, T.P. broke down in tears and exclaimed, " 'Why can't my mom just stop[?]' " According to the caregivers, although they suspected Mother and/or Grandmother were responsible for the welfare check, they had never mentioned that to T.P. He confided to the caregivers the welfare check "reminded him of when the police came to his home [and] he and his mother were hiding under the bed." When questioned by Agency, Mother denied any responsibility, claiming she first learned about the welfare check from Father.

Agency updated Father on T.P.'s pending change in placement. Father understood Mother's role in the protective issues and, after reading the Agency reports, recognized its concerns regarding Mother. Father tried to talk to Mother and encourage her to "stop what she was doing." Father

12

realized the caregivers had had enough and made arrangements to travel to San Diego. Father signed up for training with an RCH nurse to become knowledgeable about T.P.'s diabetes, and agreed to spend mealtimes with T.P. in his new placement at the Polinsky Children's Center (Polinsky).

Father and T.P. had their first supervised in-person visit on September 27. The social worker reported the visit went extremely well, as Father and T.P. "talked as though they have known each other forever." T.P. in particular appeared "completely comfortable" around Father, and requested they have an unsupervised visit outside of Polinsky. Father provided proof of completion of his training at Polinsky and RCH for managing T.P.'s diabetes. Those responsible for Father's training observed he was motivated and doing well learning T.P.'s routines, and that the two were developing a "good" relationship. (Italics omitted.)

At the September 30 special hearing, the juvenile court followed Agency's recommendation and authorized T.P.'s detention with Father in Missouri, after the court noted there were no objection to this arrangement. At Mother's request, the court set the contested adjudication-disposition hearing for November 19.

On or about October 1, T.P. and Father left for Missouri. T.P. was both "excited and nervous" about the move and told an Agency social worker he was "ready for school and to meet new family." T.P. stated his health was "really good" and he had "no complaints."[3]

---

[3] That same day, the trial court presiding over Mother's criminal case issued a CPO against her for a three-year period, requiring she have "no personal, electronic, telephonic, or written contact with [T.P.]"; she "have no contact with [T.P.] through a third party, except an attorney of record"; and she "not come within 100 yards of [T.P.]" The CPO allowed Mother to have "peaceful contact" with T.P. for court-ordered visitation as provided in any juvenile court order issued after October 1.

## D. Contested Adjudication-Disposition Hearing

In preparation for this hearing, Agency prepared a 67-page Addendum dated November 19. Agency reiterated its previous recommendations, including as relevant to this appeal that Mother have only supervised contact with T.P. Agency based this recommendation on Mother's continued inability to "implement healthy parenting styles or decision making or to prioritize [T.P.'s] needs," as she presented with "compulsive behaviors" to which she had little or no control over, even when detrimental to herself and/or her son. In particular, Mother was fixated on T.P.'s medical care and placement to such a degree that she was unable to consider the best interest of T.P. Agency also concluded Mother "has actively worked to sabotage [T.P.'s] placements," and that her actions "have negatively impacted [T.P.] several times yet this has not deterred the mother's behaviors."

Agency noted that, while it was clear Mother loves T.P., she appeared to "associate her parental role with medically caring for [T.P.] . . . in ways that are unnecessary or even fabricated." As examples, Mother maintained T.P. is/was "physically, emotionally, and psychologically unstable"; "he has psychosis, depression and anxiety"; "he is allergic to dogs," "penicillin and lidocaine"; "he is dyslexic"; "he has a predisposition to Steven Johnson's syndrome, Polycystic Kidney Disease, Osteopenia, and Osteoporosis"; "he is immunocompromised"; "he is fearful of teachers and strangers"; "he requires a fan/music/headphones to sleep" at night; "he has auditory issues"; "he has engaged in self-injurious/self-harm behaviors"; and "he is consistently weak, lethargic, thin, and losing weight."

Agency observed T.P. is "anxious, cautious, and often overwhelmed by the mother's persistent and aggressive questioning," causing him to shut down and leading him to desire less visitation time with Mother (and

14

Grandmother), which visits Agency noted were on the verge of becoming unhealthy.

Since T.P.'s removal from Mother, Agency reported T.P.'s health, including his diabetes management and emotional well-being, had drastically improved; T.P. was thriving in Father's care; T.P. had become much more "social" and "active"; and he and Father had developed a "unique" and "effortless bond."

T.P. disclosed he was doing "really well" in his new home in Missouri and had met many new "awesome" family members. Father informed Agency that T.P. had begun to "open up about his past experiences" while living with Mother and Grandmother. Father believed T.P. had been subject to "'pure manipulation'" and "emotional and verbal abuse" while in their care, reminding Father of the story about "'The Boy in the Plastic Bubble.'" Father noted T.P. did not ask for visits with Mother or Grandmother and when he did visit, T.P. afterwards was "stressed and anxious."

Father disclosed that even in the short period of time T.P. had been living with him, Mother constantly messaged Father that T.P. should not be attending in-person school and that, in any event, he should not be going to a private Catholic school because T.P. allegedly was Buddhist.[4] Mother also constantly messaged Father asking for "medical information" about T.P., and did the same with Father's relatives until they quit responding. Due to

---

[4] At the time of the November 19 Addendum, Agency reported Mother had yet to provide any evidence that, while in her care, T.P. had been engaged in any "formal or informal" schooling, despite Agency's repeated requests for such information during dependency. T.P.'s former caregivers reported T.P. struggled to write his name and add basic numbers when first placed in their home. An RCH doctor opined Mother had engaged in "[e]ducation[al] neglect" of T.P.

15

Mother's constant requests for information about T.P. and his health, Father decided against T.P. having his own cellphone.

During the reporting period, Mother expressed anger at Agency and Father for not having T.P. enrolled in therapy, which she believed he needed "ASAP" and which, in her view, was tantamount to "emotional neglect" of the child. Mother also accused Agency of being biased against her and interfering with her ability to "reunify" with and parent T.P. (despite the pending criminal charges and the issuance of the CPO). Mother claimed she was "doing everything in [her] power to make sure [T.P. was] receiving the best medical, mental, physical, emotional, and safety needs possible as [she] always ha[s]."

Mother had in-person visits with T.P. in Missouri in early November to celebrate T.P.'s 10th birthday. While Mother reported the visits went "very well," she nonetheless complained to Agency that T.P. needed to be in therapy; he was depressed, experiencing a lack of motivation, and showed symptoms of "extreme fatigue"; and he was "very skinny" and likely experiencing "circulation" problems that "need[ed] to be monitored." As before, Agency reassured Mother that T.P.'s weight was normal and he was thriving, per his November 5 pediatric assessment (a copy of which Mother received), and that he was scheduled to see an endocrinologist in a few days. Agency once again reminded Mother not to question T.P. during visits about his medical care, and to direct such concerns to her legal counsel.

Father was asked about his observations after Mother's in-person visits with T.P. in November. Father disclosed that the "only time" T.P. "seemed depressed or spiraled" out of control "was after contact with his mother." After the in-person visits, Mother messaged Father about 10 to 15 times a day asking questions about T.P., many times asking the same question over

and over. Father expressed frustration that Mother could not see the "negative impact" of her behaviors on T.P., including her unsubstantiated claims that T.P. had "physical, mental, and health issues, 'and even psychosis!' " Father made clear that he did not want to discourage or prevent contact between T.P. and Mother, but "just wanted time to give [T.P.] the tools he needed to deal with her."

On November 8, a child services agency in Missouri received a report that T.P. was being abused while in Father's care. The (anonymous) reporting party asserted T.P. was at risk because he was exposed to "drugs" and "sex offenders" in Father's home, and because Father was mismanaging T.P.'s diabetes, which could result in the child suffering a "diabetic coma." This report was investigated and deemed unsubstantiated by an Agency-equivalent in Missouri.

### 1. Treatment Updates

A few days before the November 19 contested jurisdiction/disposition hearing, Agency provided "Treatment Updates" for Mother and T.P. In this short report, Agency continued its previous recommendations including that Mother have supervised contact with T.P.

The updated report stated Mother was "actively engaged in ongoing services" and was "motivated for treatment and to obtain custody of [T.P.]"; with the " 'obstacle' " being she was a " 'high' " risk for " 'relapsed behaviors at intake.' "

T.P.'s update reflected a diagnosis of "Post-Traumatic Stress Disorder." T.P. "expressed feeling 'very angry' with his mother for removing him from the hospital absent doctor approval which led to him becoming very ill and he was working through his feelings related to his mother's lack of care. [T.P.] reported that talking to his mother, especially about his health issues, made

17

him angry and anxious; he stated, 'she never talks about fun stuff.' [T.P.] reported feeling better and feeling comforted after being put in contact with his father."

### 2. Mother's Continuance Requests

Two days before the November 19 contested adjudication-disposition hearing, Mother moved for a continuance after she retained new counsel. In support, Mother alleged there was an "actual conflict" between her and prior counsel; and that good cause existed for a continuance because her new counsel needed to familiarize himself with the case, including what counsel claimed were "complex medical issues" involving T.P. requiring counsel to "consult with and hire confidential medical experts" on Mother's behalf. The juvenile court granted Mother a short continuance, setting December 13 as the new date for the contested adjudication-disposition hearing.

On December 13, Mother again moved for a continuance of the hearing, claiming her counsel needed additional time to review voluminous discovery received from RCH. The juvenile court denied Mother's request, finding a continuance was not in T.P.'s best interest. The court also denied her alternative requests for a mistrial and/or a stay to file a writ.

### 3. Agency's Final Report

Agency prepared a final December 13 Addendum in preparation for the continued hearing. Agency's assessment and evaluation of Mother in the Addendum remained the same as in its earlier reports, noting she "continues to question, if not challenge, medical documentation and/or feedback from medical professionals regarding [T.P.] She still perceives [T.P.] as physically, emotionally, and psychologically unstable, as well as weak, lethargic, underweight, and cognitively impaired. The mother continues to fixate on determining [T.P.'s] medical care and placement while failing to consider

18

what his medical needs in fact are and what would be best for [T.P.]  Her decisions, behaviors, and actions continue to negatively impact [T.P.]  The Agency has observed minimal behavioral changes in the mother."

Agency included several e-mails Mother sent during this reporting period.  In one, she asked if T.P. could "write letters or send drawings" to her family members because she believed it would be "conducive to his fragile mental stability."  In others, she (once again) repeatedly requested updates on the "status" of T.P.'s "mental health" and whether he was scheduled to see a therapist.

Agency also summarized a number of telephone visits between Mother and T.P.  In one such visit on November 16, an Agency social worker had to redirect Mother several times after she inquired whether T.P. wanted more visits with her, including in-person, and whether he was attending the November 19 hearing.  T.P. requested that his next telephone visit be limited to 30 minutes.  The visit lasted only 20 minutes and T.P. appeared exasperated and bored while talking to Mother (and Grandmother).[5]  After T.P. left the call, Agency told Mother it was evident T.P. and Mother loved each other very much but that he clearly had wanted to end the visit early but had not done so out of concern he would hurt Mother's feelings.

During subsequent telephone visits with Mother, T.P. asked they be limited to "15, 'maybe 20 minutes.' "  During many of these visits T.P. became

---

[5]     During dependency, Agency repeatedly asked Mother to limit Grandmother's participation in visits with T.P., as Agency found Grandmother's involvement had a negative impact on him.  We note that as part of its final order on December 20 (discussed *post*), the juvenile court provided there "shall be no contact, direct or indirect, between the child and [Grandmother] pending further court order."

bored and appeared agitated when questioned by Mother regarding his emotional/psychological/physical well-being.

The December 13 Addendum also included a summary of two in-person visits between Mother and T.P. in Missouri over the Thanksgiving holidays. In one of the visits, the facilitator overheard Mother tell T.P. he "was allowed to decide if he wanted to live with her or his dad," and that a bedroom was "ready at his grandpa['s] house" in San Diego if and when T.P. returned. After the in-person visits, Mother once again notified Agency that T.P. appeared ill, claiming he was " 'extremely spacey and skinny' "; his face was " 'gaunt,' " his eyes were "very blood shot," and "his blood sugar [was] low"; and he was unable to "concentrate[e]," "stay[ ] focused," and was "confused easily." She also claimed T.P. felt "a lot of pressure" to remain living with Father, "hat[ed] school," had no extracurricular activities, and had been denied access to a diabetic support group and therapy.

Agency spoke to the principal of T.P.'s new school in Missouri. She reported the school had an established medical plan for T.P. due to his diabetes; T.P. had been assessed and it was determined he did not need an IEP,[6] at least academically; and Father had been "consistent and responsive and [the school] denied any concerns about [his] ability to care for [T.P.] or ensure [T.P.'s] needs were met."

### E. Hearing and Court's Ruling

The contested hearing took place over two days. At the hearing, Mother objected to the admission of certain Agency reports authored by social worker Natania Cibrian, who Mother argued was biased against her. In support, Mother claimed Ms. Cibrian had refused to accept Mother's

---

[6]    IEP is an acronym for Individualized Education Program.

apologies for the July 21 incident at RCH; and Ms. Cibrian had failed to acknowledge Mother's progress in services, as documented in 15 exhibits Mother submitted at the contested hearing showing she had participated in parenting and diabetes management classes, and was making progress in therapy.

Agency countered Ms. Cibrian's reports were based on her personal observations, myriad e-mails from Mother (repeated *verbatim* in Agency's lengthy reports), and the reports, observations, and assessments of neutral third parties including from Polinsky, RCH, T.P.'s former caregivers, and T.P.'s guardian ad litem/legal counsel. The court deferred its ruling on the reports' admissibility, noting it would revisit the objection during and/or after Mother's cross-examination of Ms. Cibrian.

At the hearing Ms. Cibrian testified that in Agency's opinion, Mother's contacts with T.P. should remain supervised. Ms. Cibrian noted that, despite Mother completing parenting classes and making progress in therapy, the social worker saw little to no improvement in how Mother communicated with T.P., including "prioritizing his needs and what is in his best interest" over hers. Mother called no other witnesses during the hearing.

After the close of evidence, the juvenile court overruled Mother's objection to Agency's reports, including any authored by Ms. Cibrian. Relying on "note[s]" it had made "throughout the course of the case," the court found Ms. Cibrian responded to Mother's "concerns" and "opinions" regarding T.P.'s physical and mental health by vetting them through third party "health providers," "educational providers," and similar neutral experts who properly assessed those "concerns" and "opinions," which the court noted Mother had "expressed throughout the course" of dependency. "For these reasons, the

21

court does not find that Ms. Cibrian is non-objective or biased in any way and will deny the request to exclude the reports" of Agency.

At the continued hearing on December 20, after consulting with her confidential medical expert Mother rested. During closing argument, T.P.'s guardian ad litem informed the court that T.P. did not want to participate in the hearing, but wanted the court to know that he agreed with the recommendations of Agency, including that visits with Mother remain supervised. The guardian ad litem also informed the court that T.P. was "happy" living with Father and "likes his phone calls with his mother" but was "not asking for any more than the two phone calls a week that he's having right now" with Mother.

Mother requested the section 300 petition be dismissed. Alternatively and as relevant to this appeal, she requested unsupervised "extensive contact" with T.P.

The juvenile court adopted Agency's recommendations. The court found the section 300, subdivision (b) petition true by clear and convincing evidence; it elevated Father's paternity status to presumed, placed T.P. with Father, terminated jurisdiction, and issued exit orders. In so doing, the court found over the course of dependency Mother had assessed T.P.'s "medical needs" and "his conditions" and that her diagnoses "were not supported by [T.P.'s] actual treatment providers or third party witnesses engaged with [T.P.] in providing services to him"; and "in fact, the past assessments made by the mother were not . . . supported but were actually in error and proved to be life-threatening" for T.P.

Regarding visits, the juvenile court's custody order provided Mother would have three weekly supervised video phone calls and in-person supervised visitation with T.P. in Missouri.

# DISCUSSION

## A.  Guiding *Principles*

Pursuant to section 362.4,[7] "[w]hen a juvenile court terminates its jurisdiction over a dependent child, it is empowered to make 'exit orders' regarding custody and visitation."  (*In re T.H.* (2010) 190 Cal.App.4th 1119, 1123; ["exit orders" "become part of any family court proceeding concerning the same child and will remain in effect until they are terminated or modified by the family court"], *id.* at p. 1122.)

When deciding custody and visitation in any dependency case, the juvenile court's primary consideration must always be the best interest of the child in the context of the peculiar facts of the case.  (*In re Chantal S.* (1996) 13 Cal.4th 196, 206 (*Chantal*); *In re Nicholas H.* (2003) 112 Cal.App.4th 251, 268 ["When making a custody determination in any dependency case, the court's focus and primary consideration must always be the best interests of the child."].)  The juvenile court is not restrained by " 'any preferences or presumptions' " prescribed by the Family Code in fashioning exit orders pursuant to section 362.4.  (*Nicholas*, at p. 268, quoting *Chantal*, at p. 206.)  Instead, the court has broad discretion in fashioning a visitation order, and must be guided by the totality of the circumstances.  (*Chantal*, at pp. 201, 206.)

---

7    Section 362.4, subdivision (a) provides in relevant part:  "If the juvenile court terminates its jurisdiction over a minor who has been adjudged a dependent child of the juvenile court prior to the minor's attainment of the age of 18 years, and . . . an order has been entered with regard to the custody of that minor, the juvenile court on its own motion, may issue a protective order . . . and an order determining the custody of, or *visitation with*, the child."  (§ 362.4, subd. (a), italics added.)

We review the juvenile court's custody and visitation exit orders for abuse of discretion. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318 (*Stephanie*); *Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 300.) A court abuses its discretion when it exceeds the bounds of reason by making a decision that is arbitrary, capricious or patently absurd. (*Stephanie*, at p. 318.) Under the abuse of discretion standard, when two or more inferences reasonably can be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the court. (*Id.* at pp. 318-319.)

## B. Analysis

Under the circumstances of this case, the juvenile court did not abuse its discretion by ordering T.P.'s telephonic/video and in-person visits with Mother be supervised.[8]

First, substantial evidence supports the finding that it was in T.P.'s best interest to have his contacts with Mother remain supervised. (See *Chantal, supra*, 13 Cal.4th at p. 206.) Although the record reflects Mother maintained she was attempting to protect T.P., the record shows that Mother lacked the insight to ensure T.P.'s medical needs were met not only at the

---

[8] To determine whether the juvenile court abused its discretion in admitting various Agency reports, as Mother argues on appeal, we consider the context in which the ruling was made and, if such an abuse exists, whether there was resulting prejudice. (See e.g., *Coastside Fishing Club v. California Fish & Game Com.* (2013) 215 Cal.App.4th 397, 428.) To facilitate such an analysis, appellants are required to set forth all significant facts, both favorable and unfavorable, in their opening briefs. (See Cal. Rules of Court, rule 8.204(a)(2)(C) [the appellant's opening brief must "[p]rovide a summary of the significant facts limited to matters in the record"].)

Mother has failed to comply with rule 8.204(a)(2)(C) by selectively presenting evidence most favorable to her and omitting many material facts that we have summarized *ante*. Despite the deficiency, we decide this appeal on the merits and base our decision on a thorough summary of this evidence.

time of his hospitalization in July 2021 for a potentially life-threatening condition (i.e., ketoacidosis) but throughout dependency.

As noted by the juvenile court, multiple third party professionals evaluated T.P. to address Mother's ongoing "concerns" and "opinions" regarding T.P.'s physical and mental health. Other than diabetes, doctors found T.P. to be "extremely healthy," much to T.P.'s relief. After his removal from Mother, T.P. also reported he was feeling well and his diabetes was under control, as he was speaking with a medical professional every few days charting his blood sugar levels and weight. Mother, however, refused to accept that T.P. was feeling and doing well and not suffering from a variety of physical and mental health issues that she *alone* diagnosed, disregarding the reports of T.P.'s doctors and other health care professionals.

As an example of Mother's lack of insight, Mother (and Grandmother) had T.P. test his blood sugar three times over a 90-minute period during an August 4 supervised visit, despite the fact T.P. was only required to test at mealtime and before bed. Notwithstanding his being under the care of doctors and having an approved diet, during this visit Mother insisted T.P.'s blood sugar was too low, and he needed to keep "candy" in his backpack for such circumstances. Mother gave T.P. a food item that was not on his list of approved snacks because she claimed he allegedly was doing so poorly he might need an "ambulance." When questioned the following day about this visit, Mother denied asking T.P. to test his blood sugar three times, claiming T.P. had done so on his own volition.

Even near the end of dependency when Agency was recommending placement with Father and termination of jurisdiction, and after Mother had participated in therapy and parenting classes, she continued to insist T.P. was physically and mentally unwell. During the final reporting period,

25

Mother inquired whether T.P. could write letters or send drawings to her relatives because it would be "conducive to his *fragile* mental stability." (Italics added.) After her in-person visit with T.P. in Missouri, she complained he was depressed, showed signs of "extreme fatigue," was too skinny due to mismanagement of his diabetes, and was likely experiencing "circulation problems" and/or suffering complications from court-ordered immunizations. These complaints coincided with an unsubstantiated report from an "anonymous" reporter to a child services Agency in Missouri that Father was mismanaging T.P.'s diabetic condition, putting T.P. at risk for a "diabetic coma." As noted, follow-up inquiries established these reports were unfounded.

The record also shows that as dependency continued and T.P. began to develop insight into Mother's protective issues, he became increasingly frustrated and agitated by Mother's aggressive and constant questioning of his physical and mental well-being. For example, while living with his caregivers, T.P. disclosed he did not want to tell Mother about his activities, even if they were "fun," because of how she "responded to an illness." After placement with Father, T.P. wanted less visits with Mother, then requested the visits be limited to "15, 'maybe 20 minutes,' " and agreed the visits should end before the allotted time if Mother during the call needed redirection more than once.

Father also reported that T.P. was anxious before visits with Mother and would sometimes take an entire day to calm down after they ended. Father did not want to discourage these visits, but only to give T.P. "time" to develop the "tools" he needed to "deal with" Mother.

Based on the record as a whole, we cannot conclude the juvenile court's decision requiring supervised visitation between Mother and T.P. was

"arbitrary, capricious, or patently absurd." (See *Stephanie*, *supra*, 7 Cal.4th at p. 318.) To the contrary, this decision appears reasonable in light of Mother's refusal to prioritize T.P.'s needs and well-being over her penchant for medically diagnosing T.P., as occurred throughout dependency. (See *Chantal*, *supra*, 13 Cal.4th at p. 206.)

Second, we disagree with Mother that Agency's reports, including those authored by Ms. Cibrian, showed Agency bias toward Mother. Initially, we note the juvenile court rejected this same argument in ruling to admit Agency's reports. (See *In re Marriage of Greenberg* (2011) 194 Cal.App.4th 1095, 1099 ["The trial court sits as trier of fact and it is called upon to determine that a witness is to be believed or not believed. This is the nature of fact finding. 'The trier of fact is the sole judge of the credibility and weight of the evidence.' "].)

Furthermore, Agency's reports contain myriad *verbatim* e-mails and/or messages from Mother to Agency, Father, and others. These communications by Mother speak for themselves, and as we have summarized, support the finding that the best interest of T.P. was for visits with Mother to remain supervised.

Finally, many others agreed with Agency's assessment of the protective issues involving Mother and her lack of insight into those issues, including T.P.'s former caregivers, Father, staff at RCH and Polinsky, and T.P. himself (through his guardian ad litem). Thus, Agency was hardly alone in identifying Mother's protective issues in this case.

We acknowledge Mother's efforts to gain insight into the protective issues that led to T.P.'s detention, the issuance of the CPO, and ultimately T.P.'s placement with Father. But the juvenile court's primary consideration is and must be the best interest of T.P. Here, the record supports the court's

conclusion that supervised visitation with Mother was in T.P.'s best interest at the time the order was made.[9]

## DISPOSITION

The juvenile court's December 20 order following the contested adjudication-disposition hearing, including its custody order requiring supervised visitation between Mother and T.P., is affirmed.

HALLER, J.

WE CONCUR:

HUFFMAN, Acting P. J.

DO, J.

---

[9] In light of our decision on the merits, we deem it unnecessary to reach Agency's alternative argument that Mother forfeited her claim of error based on her agreement to supervised visitation at the contested adjudication-disposition hearing. (See *In re S.B.* (2004) 32 Cal.4th 1287, 1293 [ordinarily, a failure to object in the juvenile court precludes raising the issue on appeal].)